## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **MARTHA FOX,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 14-CV-2606-JAR** |
| **PITTSBURG STATE UNIVERSITY,** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

Plaintiff Martha Fox brings this action against her former employer, Defendant Pittsburg State University ("PSU"), alleging claims of sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964, and Title IX of the Education Amendments of 1972.[1]  Before the Court are Plaintiff's Motion to Exclude Testimony of Defendant's Expert Witness (Doc. 104) and Defendant's Motion for Summary Judgment (Doc. 111).  The motions are fully briefed and the Court is prepared to rule.[2]  For the reasons explained in detail below, the Court grants Plaintiff's motion to exclude expert testimony, and grants in part and denies in part Defendant's motion for summary judgment.

### I.        Plaintiff's Motion to Exclude Expert Testimony

### A.        Proposed Testimony of Dr. Anderson

Plaintiff alleges that she suffered emotional and mental distress as a result of the sexual harassment and retaliation she faced while employed at PSU.  Defendant seeks to introduce Dr. Anderson's testimony to show that Plaintiff's emotional distress could be linked to medications

---

[1] 20 U.S.C. §§ 1681 *et seq.*

[2] The parties did not request a hearing on Plaintiff's motion to exclude expert testimony, and the Court finds that a hearing is not necessary.

she was taking at the time of the alleged harassment.  His testimony centers on the types of adverse side effects that some patients experience as a result of the same medications Plaintiff was taking.

Dr. Anderson is an internal medicine specialist with degrees in pharmacology and toxicology.  Dr. Anderson did not examine Plaintiff in connection with this case.  Rather, he examined data from a database called Lexicomp and from FDA package inserts for seven medications that Plaintiff was taking during the time period covered in this case.  According to Dr. Anderson, Lexicomp provides postmarketing data about drugs, which can come from numerous sources, including clinical trials and surveys.  He did not review the underlying studies or articles that formed the Lexicomp data.  Dr. Anderson concluded that the symptoms of emotional and mental distress she claims—depression, anxiety, loss of sleep, and embarrassment—could have been caused by the medications she was taking.

Plaintiff argues that Dr. Anderson's opinion should be excluded because it is unreliable, it will not help the jury, and its probative value is outweighed by the danger of undue prejudice and confusion of the issues.  Defendant contends that it seeks to admit Dr. Anderson's testimony to educate the jury about general principles, and therefore a relaxed test under Rule 702 should apply to allow his testimony.

### B.      Legal Standard

The Court has broad discretion in deciding whether to admit expert testimony.[3] Generally,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

---

[3]*Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996).

     (a) the expert's scientific, technical, or other specialized knowledge will
         help the trier of fact to understand the evidence or to determine a fact in
         issue;
     (b) the testimony is based on sufficient facts or data;
     (c) the testimony is the product of reliable principles and methods; and
     (d) the expert has reliably applied the principles and methods to the facts of
         the case.[4]

The proponent of expert testimony must show "a grounding in the methods and procedures of science which must be based on actual knowledge and not subjective belief or unaccepted speculation."[5]  In order to determine whether an expert opinion is admissible, the Court performs a two-step analysis.  "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his discipline.'"[6]  To determine reliability, the Court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid."[7]  Second, the district court must further inquire into whether the proposed testimony is sufficiently "relevant to the task at hand."[8]  An expert opinion "must be based on facts which enable [him] to express a reasonably accurate conclusion as opposed to conjecture or speculation . . . absolute certainty is not required."[9]  And it is not necessary to prove that the expert is "indisputably correct," but only that the "method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements."[10]

---

[4] Fed. R. Evid. 702.

[5] *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 780 (10th Cir. 1999).

[6] *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (10th Cir. 2005) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)).

[7] *BG Tech., Inc. v. Ensil Int'l Corp.*, 464 F. App'x 689, 703 (10th Cir. 2012).

[8] *Id.* (quoting *Daubert*, 509 U.S. at 597).

[9] *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).

[10] *Id.*

*Daubert* sets forth a non-exhaustive list of four factors that the trial court may consider when conducting its inquiry under Rule 702: (1) whether the theory used can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) general acceptance in the scientific community.[11] But "the gatekeeping inquiry must be tied to the facts of a particular case."[12]

Occasionally, courts allow generalized expert testimony to be admitted to explain general or background information. The Advisory Committee's note to Fed. R. Evid. 702 explains that

> it might be important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case. For example, experts might instruct the factfinder on the principles of thermodynamics, or bloodclotting, or on how financial markets respond to corporate reports, without ever knowing about or trying to tie their testimony into the facts of the case. . . . For this kind of generalized testimony, Rule 702 simply requires that: (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony "fit" the facts of the case.[13]

This is the theory upon which Defendant seeks to admit the expert testimony of Dr. Anderson.

## C.    Discussion

The Court does not find that the "generalized" testimony being offered by Defendant will assist the trier of fact.[14] The information Dr. Anderson would present in this case is more likely to confuse the jury than help it. On one hand, Defendant suggests that the testimony would be of a general nature, intended to educate laypeople who do not have the expertise to know about adverse effects of medications. At the same time, however, Defendant seeks to present an expert

---

[11]*Daubert*, 509 U.S. at 593–94.

[12]*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1998) (quotations omitted).

[13]*Procter & Gamble Co. v. Haugen*, No. 1:95-CV-94 TS, 2007 WL 750435, at *1 (D. Utah Mar. 7, 2007) (quoting Fed. R. Evid. 702, advisory committee's note, 2000 Amendments).

[14]*See United States v. Hopson*, No. 12-CR-00444-LTB, 2014 WL 4375726, at *3 (D. Colo. Sept. 4, 2014).

opinion that Plaintiff's emotional and mental distress could have been caused by her medications.  General information about prescription medications might be admissible in some other form, but expert testimony about such information is not necessary or helpful for the jury to understand Defendant's argument Plaintiff's emotional distress may have been caused by something besides sexual harassment.

Furthermore, having an expert draw such a conclusion is contrary to the principle behind allowing generalized expert testimony.  Where courts have permitted generalized expert testimony, they have not allowed the general principles to be applied by the expert to the facts of the particular case.[15]  Here, however, Defendant's purpose for seeking to admit Dr. Anderson's testimony is precisely to tie the general principles about various medications and their side effects to Plaintiff's situation.  This is not an appropriate use of generalized expert testimony. The Court therefore grants Plaintiff's motion to exclude Dr. Anderson's testimony.

## II.    Defendant's Motion for Summary Judgment

### A.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[16]  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[17]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[18]  A fact is "material" if, under

---

[15]*Id.*

[16]Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[17]*City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[18]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

the applicable substantive law, it is "essential to the proper disposition of the claim."[19]  An issue

of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the

non-moving party.'"[20]

The moving party must initially show the absence of a genuine issue of material fact and

entitlement to judgment as a matter of law.[21]  In attempting to meet this standard, a movant that

does not bear the ultimate burden of persuasion at trial need not negate the other party's claim;

rather, the movant need simply point out to the court a lack of evidence for the other party on an

essential element of that party's claim.[22]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to

"set forth specific facts showing that there is a genuine issue for trial."[23]  The nonmoving party

may not simply rest upon its pleadings to satisfy its burden.[24]  Rather, the nonmoving party must

"set forth specific facts that would be admissible in evidence in the event of trial from which a

rational trier of fact could find for the nonmovant."[25]  To accomplish this, the facts "must be

identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated

[19]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[20]*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[21]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[22]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[23]*Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[24]*Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[25]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

therein."[26]  Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[27]  The nonmoving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[28]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[29]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[30]

## B.    Admissibility of Evidence

Plaintiff disputes the admissibility of affidavits by Dr. Joanne Britz and Kay Lynn Jiles as hearsay.  Britz states in her affidavit that she was present for the hair touching incident at McCray Hall; Jiles states that she was present for the incident in the Physical Plant.

"At the summary judgment stage, evidence need not be submitted 'in a form that would be admissible at trial.'"[31]  "Parties may, for example, submit affidavits in support of summary judgment, despite the fact that affidavits are often inadmissible at trial as hearsay, on the theory that the evidence may ultimately be presented at trial in an admissible form."[32]  But "the content

---

[26]*Adams*, 233 F.3d at 1246.

[27]Fed. R. Civ. P. 56(c)(4).

[28]*Id.*; *Argo v. Blue Cross Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[29]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[30]*Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

[31]*Argo*, 452 F.3d at 1199 (quoting *Celotex*, 477 U.S. at 324).

[32]*Id.* (citing *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005).

or substance of the evidence must be admissible."[33]  "Thus, for example, at summary judgment courts should disregard inadmissible hearsay statements *contained* in affidavits, as those statements could not be presented at trial in any form."[34]

The affidavits by Dr. Britz and Jiles are each based on their personal accounts of the hair touching incidents.  They may testify at trial, and their personal observations would be admissible during their trial testimony; they are thus admissible in affidavit form at the summary judgment stage.  Statements by Plaintiff contained within the affidavits, including her permission to Jana Giles to touch her hair, are admissible pursuant to Fed. R. Evid. 801(d)(2) as statements by a party opponent.  Statements within the affidavits by Jana Giles about how she used to be a beautician and about her belief that people with thyroid conditions have bad hair are not being offered for the truth of the matter asserted, and therefore are not hearsay.  Giles's request for permission to touch Plaintiff's hair is merely a question, not an assertion as contemplated by Fed. R. Evid. 801.[35]  The Court therefore considers the two affidavits as admissible evidence in support of Defendant's summary judgment motion.[36]

### C.    Uncontroverted Facts

The following material facts are uncontroverted or viewed in the light most favorable to Plaintiff as the nonmoving party.

---

[33]*Id.* (citing *Thomas v. Int'l Bus. Machs.,* 48 F.3d 478, 485 (10th Cir.1995).

[34]*Id.*

[35]*See United States v. Jackson*, 88 F.3d 845, 848 (10th Cir. 1996) ("Although 'assertion' is not defined in Rule 801, the advisory committee notes state that 'nothing is an assertion unless intended to be one . . . . [T]he important question is whether an assertion was intended . . . . Rule 801 places the 'burden upon the party claiming that the intention [to make an assertion] existed; ambiguous and doubtful cases will be resolved against him and in favor of admissibility.'") (internal citations omitted).

[36]Plaintiff's statement that Britz and Kay Lynn Jiles were also private employees of Jana Giles's cleaning business is not relevant to the admissibility of their affidavits, but only to their credibility, which is not properly considered by the Court on summary judgment.

Plaintiff Martha Fox was employed as a custodial specialist at Defendant PSU from July 2010 until her voluntary resignation in November 2015.  Her husband, Rick Fox, was also a custodial employee at PSU.  Before the events in question in this case, Plaintiff was never disciplined during the course of her employment and her work performance never fell below a satisfactory rating.  At some point near the beginning of her employment, Plaintiff was assigned to clean McCray Hall at PSU.  Jana Giles was the lead worker in charge of McCray Hall at that time.  Around February 2013, Giles was assigned to clean Axe Library and was no longer the lead worker at McCray Hall.  Giles worked in Custodial Services at PSU from 1990 until she retired in September 2014.  Beginning in December 2000, Giles held the position of Custodial Supervisor Senior.  Her duties in that role were to ensure that all cleaning was completed in her assigned buildings.  Giles did not have authority to take employment actions, such as promotions, terminations, transfers, demotions, or suspensions.  She did not have the authority to issue oral or written warnings or to evaluate other employees' work.

Beginning in October 2011, Kevin Malle was the Physical Plant Supervisor at PSU.  He was Plaintiff's immediate supervisor, and was also Giles's immediate supervisor.  Mary Wanda Endicott was the Director of Custodial and General Services from 2007 until 2015.  She oversaw all custodial and general services staff, including custodial supervisors, general maintenance repair technicians, and custodial specialists.

PSU has policies in place regarding grievances and investigations of discrimination, harassment, and retaliation.  Those policies provide that when an employee believes that his or her rights have been violated due to sex, he or she should contact either an immediate supervisor or the Director of Equal Opportunity and Affirmative Action.  The Director of Equal Opportunity and Affirmative Action at PSU during the relevant time was Cindy Johnson.

9

Grievances by custodial employees that do not involve discrimination or sexual harassment are covered by the Grievance Procedure in the Memorandum of Agreement between Pittsburg State University and AFT Kansas for Service and Maintenance Employees. That procedure provides that an employee is to report his or her grievance to an immediate supervisor. If the employee believes a discussion with his or her immediate supervisor is inappropriate, or if he or she is not satisfied with the response, the employee is required to take the complaint up the supervisory chain, including to the department director and the Director of Human Resources. Employees are permitted to use computer terminals located on PSU's campus to review PSU's policies.

Jana Giles began sexually harassing Plaintiff in April 2012, and the harassment increased in March or April 2013. Plaintiff alleges that on two separate occasions, Giles touched her hair without her permission. The evidence suggests that these two events took place sometime in 2012. One occasion took place in the Physical Plant in front of the time clock. Plaintiff claims that Giles touched her hair and stated "It looks like today you don't have a hair out of place, you didn't do nothing all day long." Plaintiff claims no one else was there at the time, and she told Giles to stop. At her deposition, Giles denied touching Plaintiff's hair on this occasion. Another custodial employee, Kay Lynn Jiles, submitted an affidavit stating that she was present at the time clock when the hair touching took place, and Jiles had been playing with Plaintiff's hair. Jiles states that Jana Giles asked Plaintiff before touching her hair, and Plaintiff granted Giles permission to do so.

The second hair touching incident took place in McCray Hall; Fox claims that Giles touched her hair without her permission and then told her she had beautiful hair and she looked good. Fox claims that no other staff was present for this incident. Giles acknowledges that she touched Plaintiff's hair in McCray Hall, but claims that Plaintiff gave her permission to do so.

Dr. Joanne Britz, a professor at PSU, submitted an affidavit stating that she was present and observed the interaction between Plaintiff and Giles.  According to Giles and Dr. Britz, the three of them were discussing Plaintiff's thyroid problem, and Giles stated that she was a cosmetologist and asked to touch Plaintiff's hair because she believed people with thyroid conditions tend to have dry hair.  Giles and Britz both state that Plaintiff gave Giles permission to touch her hair and did not ask her to stop.

Over the course of two years, Giles repeatedly made a "hu-hu-hu" noise in a sexual manner to Plaintiff and stated "I practiced this for you all night" or "I practiced this for you all day."  Giles repeatedly called her a bitch and told her she stunk and that she smelled like a skunk.  On one occasion Giles told Fox "Get your ass in there and pull the trash and – and wipe the toilets down."  Giles also sat in Plaintiff's custodial room with the lights off more than once, and when Plaintiff walked in, she said "You finally made it."  Giles asked Plaintiff about her sex life repeatedly, and wiped her crotch in front of Plaintiff.  According to Plaintiff's husband, Giles asked him how Plaintiff tasted on one occasion.  Giles asked Plaintiff whether she had ever been with a woman and sent Plaintiff text messages that said "I love Rick."  On one occasion, while Plaintiff and Giles were cleaning the bathroom in McCray Hall, Giles tried to rub her body against Plaintiff's.  Plaintiff also claims that Giles enlisted another custodian, Cathy Butler Brown, to harass Plaintiff as well.  Butler Brown would routinely ask Giles whether she should mess with Plaintiff, and she would wipe her crotch and make the "hu-hu-hu" noise at Plaintiff.  Plaintiff also claims Giles followed her home on three occasions.[37]

Plaintiff claims she spoke to Kevin Malle about the harassment before the fall of 2013, on multiple occasions.  Malle denies that Plaintiff ever mentioned harassment to him.  There is no

---

[37]PSU disputes this allegation.  The evidence indicates that Giles and Plaintiff lived very close to one another and sometimes took the same route home.

documentation by Malle or anyone else about sexual harassment allegations by Plaintiff before the fall of 2013.  Plaintiff also claims that another employee, Sandra Brown, complained to Malle and Endicott on Plaintiff's behalf about the harassment.  In September 2013, Plaintiff and Giles got into a heated argument in the Physical Plant.  Giles used profanity towards Plaintiff, calling her a bitch and stating, "All that's a bunch of lies, you bitch I'm going to beat the shit out of you."  Giles also said "I'm going to wipe your ass" or "I'm going to use you to wipe my ass." Malle heard this argument from his office and brought Plaintiff and Giles to Endicott's office, where the four met together.  During this meeting, Plaintiff reported that Giles had been doing a "fake cough," the "hu-hu-hu" noise, and saying "I've been practicing this for you all night." Plaintiff had been saying "eww" to Giles as she walked past.  Plaintiff also accused Giles of taking supplies from work and not doing all of her work at McCray Hall.  During the heated conversation in Endicott's office, Giles challenged Plaintiff to a fist fight.  Plaintiff also claims that Giles threw her sunglasses at her.  Giles, Endicott, and Malle all testified that Giles threw or accidentally flung the sunglasses into the corner of the room, not at Plaintiff.

At some point during this meeting in September 2013, Plaintiff claims she stated "Jana looks at me with them eyes like she's going to undress me with her eyes."  Although the testimony of Malle, Endicott, and Giles varies slightly in terms of the specific words used by Plaintiff, they all state that Plaintiff said something along the lines of "You make me sick. I can't stand to look at you. The Bible says what you're doing is wrong," "I can look in your eyes and see what you're thinking," and "I can wear my hair up, I can wear makeup, I'm a woman, Jana." Plaintiff acknowledges that she said something about being able to wear her hair up and makeup.

Plaintiff claims that she accused Giles of sexual harassment in the meeting with Malle and Endicott, and that she reported sexual harassment to them.  The testimony from the four

participants in the meeting differs.  Malle and Endicott testified that they did not understand Plaintiff's complaints to be about sexual harassment and did not believe the dispute to be sexual in nature.[38]  Giles's testimony acknowledges that she interpreted Plaintiff's complaints to be about sexual harassment.

At the end of the meeting, Endicott asked Plaintiff and Giles whether the problem was resolved, and they both agreed that it was.  By this time, Plaintiff and Giles worked in different buildings relatively far from each other.  Two days after the meeting between Plaintiff, Giles, Malle, and Endicott, Plaintiff approached Endicott and told her that she did not think the problem was resolved.

On February 18, 2014, while custodians were waiting in line at the time clock, Fox video recorded Cathy Butler Brown reach toward her own groin area and say "picture this" to Plaintiff.  The next day, February 19, 2014, Plaintiff and her husband showed the video to Endicott and told her that they did not want to see Giles at the time clock anymore.  Endicott told Plaintiff that the best thing for her to do to avoid Giles would be to wait outside the Physical Plant until Giles clocked out, and to go in and clock out after her.  The Foxes then brought the video to Cindy Johnson, Director of Equal Opportunity and Affirmative Action, and reported that Giles was sexually harassing Plaintiff.  This was the first time Johnson had heard any allegations that Plaintiff was being sexually harassed.  Johnson asked Plaintiff to provide a written statement detailing, in chronological order, the harassment she was alleging.  On February 27, 2014, Plaintiff gave Johnson a handwritten statement that contained her allegations.  Cathy Butler Brown received a written reprimand in her employee file, and a security camera was installed at

---

[38]According to Endicott's deposition, she asked Plaintiff at this meeting whether Plaintiff was alleging that Giles was sexually harassing her, and Plaintiff did not answer.

the time clock.  Giles's hours were changed by 30 minutes so that she and Plaintiff would not see each other at the time clock.

Meanwhile, on February 21, 2014, Plaintiff and her husband arrived at the Physical Plant to clock out and saw Giles's girlfriend, Kristi McGowan, outside the Physical Plant.  Plaintiff claims that McGowan was flashing the headlights of her car and that McGowan was staring at Plaintiff.  When Plaintiff and her husband arrived home that night, McGowan was in her car outside of their house and got into a yelling match with Plaintiff's husband.  At some point Giles drove to the top of Plaintiff's street and stayed there in her car while McGowan and Rick Fox interacted.  The police came and diffused the situation.  Plaintiff and her husband reported the incident to Malle and Endicott the next day, who told them that they could not do anything because it was not on university property and McGowan was not a university employee.

Johnson opened an investigation into Plaintiff's claims, and interviewed Plaintiff, Giles, Endicott, and Malle.  She also received a written statement from Rick Fox, Plaintiff's husband.  Giles denied Plaintiff's allegations except that she admitted to making the "hu-hu-hu" coughing noise, which she said had no sexual connotation.  Johnson also contacted the Human Resource Office at PSU to determine whether either Plaintiff or Giles had previous disciplinary action, and found that neither did.  Johnson did not interview other custodial employees.  Plaintiff claims that she and her husband provided Johnson with names of other employees they wanted Johnson to interview, including Cathy Butler Brown and Sandra Brown.  Johnson testified that those names were only provided after the investigation was completed or were provided by Plaintiff's husband, not Plaintiff herself.

When Johnson interviewed Endicott in connection with Plaintiff's complaint, Endicott told Johnson about the September 2013 meeting, including Plaintiff's statements to Giles.

Johnson ultimately concluded that Giles was not sexually harassing Plaintiff, but there was a mutually-created dispute between Plaintiff, Rick Fox, and Giles.  She also found that Plaintiff's statements to Giles in the meeting with Endicott and Malle violated PSU's anti-discrimination policy in that they were discriminatory against Giles because of her sexual orientation.  Johnson, Malle, Endicott, and Giles all interpreted Plaintiff's statements to be about Giles's sexuality, even though Plaintiff did not use the word "homosexual" or use derogatory language.  Johnson required Plaintiff, Rick Fox, and Giles to undergo training about sexual harassment, hostile work environment, retaliation, and bullying.  Johnson's findings were detailed in a letter to Plaintiff. According to Michele Sexton's affidavit and PSU policy, there is nothing in Plaintiff's personnel file referencing Johnson's findings of discrimination or the training that Plaintiff, Rick Fox, and Giles were required to undergo.  Plaintiff did not appeal Johnson's findings, but filed her Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").  Plaintiff claims that she suffered from panic attacks as a result of Giles's harassment, which affected her ability to complete her work.  She did not seek medical attention or mental health services, nor did she receive any negative evaluations at work.

## D.    Discussion

### i.    Timing of Charge of Discrimination

Defendant argues that some of Plaintiff's claims, including the two hair touching incidents, are time barred.  Under Title VII, a plaintiff's allegation is timely if she filed her EEOC charge within 300 days of the alleged unlawful employment practice.[39]  In this case, Plaintiff filed her charge of discrimination on March 28, 2014.  Defendant argues that allegations

---

[39]*Semsroth v. City of Wichita*, 304 F. App'x 707, 714 (10th Cir. 2008).

of harassment occurring before June 2013 should not be considered because they fall outside of the 300-day window for Title VII claims.

Hostile work environment claims generally "do not consist primarily of discrete acts, but often involve a series of incidents that span a period longer than 300 days."[40]  Recognizing this, the Supreme Court has held that "as long as 'an act' contributing to a hostile work environment took place no more than 300 days before the plaintiff filed an EEOC charge, a court may consider the complete history of acts comprising that hostile work environment."[41]  This does not allow the employee to unreasonably delay filing her hostile work environment claim, however.[42]  "[W]hen analyzing a hostile work environment claim spanning longer than 300 days 'a court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period.'"[43]  The acts that occurred before the 300-day mark must be related to the acts occurring within the 300-day period.  "[A] series of alleged events comprises the same hostile environment where 'the pre- and post-limitations period incidents involved the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers.'"[44]

Here, it is clear that Plaintiff's allegations of harassment that occurred before June 1, 2013 are related to the allegations of harassment during the 300-day window.  Although she only alleges two incidents of hair touching, she alleges other instances of verbal harassment and one

---

[40] *Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver*, 397 F.3d 1300, 1308 (10th Cir. 2005).

[41] *Id.* (quoting *Nat'l RR. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002).

[42] *Id.*

[43] *Id.* (quoting *Morgan*, 536 U.S. a t120).

[44] *Id.* at 1309 (quoting *Morgan*, 536 U.S. at 120).

instance of physical harassment by Giles (trying to rub against her while cleaning bathrooms) that took place with regularity throughout the period of April 2012 until February 2014.  She alleges that the harassment escalated in March or April 2013, but the uncontroverted facts, viewed in the light most favorable to Plaintiff, show that there was no time period during that span in which the harassment stopped or its character changed.  The Court therefore finds that Plaintiff's claims are not time barred under Title VII.[45]

### ii.  Sexual Harassment

Count I of Plaintiff's Complaint asserts a claim of sexual harassment and hostile work environment.  Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."[46]  A plaintiff may establish a Title VII discrimination claim by showing that the sexual harassment has caused a hostile or abusive work environment.[47]  In order to establish a prima facie case of sexual harassment under a hostile work environment theory, Plaintiff must show that she was subjected to unwelcome harassment based on her sex and that, due to the harassment's severity or pervasiveness, the harassment altered a term, condition or privilege of his employment and created an abusive working environment.[48]

---

[45]Defendant does not argue in its motion that Plaintiff's claims are time barred under Title IX, although Plaintiff addresses that possibility in her opposition brief.  The Court sees no need to address such an argument because Defendant does not raise it, and in any event Title IX does not contain a clear time limit such as the one found in Title VII.

[46]42 U.S.C. § 2000e–2(a)(1).

[47]*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66–67 (1986).  Plaintiff does not assert a claim of quid pro quo sexual harassment, the other way a plaintiff can establish sexual harassment under Title VII.  *See id.*

[48]*Hollis v. Acoustic Sounds, Inc.*, No. 13-2083-JWL, 2014 WL 806190, at *4 (D. Kan. Feb. 28, 2014) (citing *Kline v. Utah Anti-Discrimination & Labor Div.*, 418 F. App'x 774–81 (10th Cir. 2011)).

Count III asserts a claim of sex discrimination and sexual harassment under Title IX. Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."[49]  "Sexual harassment is a form of discrimination on the basis of sex and is actionable under Title IX."[50]  The Supreme Court has held that the prohibitions against sex discrimination in Title IX also apply to employees of institutions that receive federal funds, not only to students.[51]  "Courts have generally assessed Title IX discrimination claims under the same legal analysis as Title VII claims."[52]

> To establish that a sexually hostile work environment existed, a plaintiff must prove the following elements: (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment.[53]

Under Title VII, if a plaintiff satisfies these elements, she must identify one of three possible bases for holding her employer liable.[54]  Here, Plaintiff alleges that PSU was negligent.  This allegation requires Plaintiff to establish that PSU "had actual or constructive knowledge of the hostile work environment but did not adequately respond to notice of the harassment."[55]  To

---

[49]20 U.S.C. § 1681(a).

[50]*Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1152 (10th Cir. 2006) (citing *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 72 (1992)).

[51]*North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 530 (1982).

[52]*Gossett v. Okla. ex rel. Bd. of Regents*, 245 F.3d 1172, 1176 (10th Cir. 2001).

[53]*Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007) (quoting *Dick v. Phone Directories Co., Inc.*, 397 F.3d 1256, 1262–63 (10th Cir. 2005)) (internal brackets and quotation marks omitted).

[54]*Id.*

[55]*Id.* (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 673 (10th Cir. 1998).

prove her Title IX claim, Plaintiff must show that PSU had actual notice of the discrimination and demonstrated deliberate indifference to it.[56]

Defendant only disputes the fourth element of the test for a hostile work environment, arguing that the harassment Plaintiff faced in this case was not severe or pervasive.  It also contends that PSU did not have actual or constructive notice of sexual harassment until February 19, 2014, and after Plaintiff reported the harassment on that date, PSU conducted a thorough and adequate investigation of her allegations.

### 1.  **Severe or Pervasive Harassment**

Plaintiff must show that the harassment was objectively and subjectively so severe or pervasive that it altered a term, condition, or privilege of her employment.[57]  The Tenth Circuit has recognized that "'the severity and pervasiveness evaluation is particularly unsuited for summary judgment' because it is inherently fact-bound by nature."[58]  Whether the harassment is objectively "severe or pervasive" is determined from the totality of the circumstances after "considering such factors as 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"[59]  This objective inquiry focuses on the perspective of a "reasonable person in the plaintiff's position, *considering all the*

---

[56]*Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

[57]*Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012).

[58]*Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1222 (10th Cir. 2015) (quoting *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999)).

[59]*Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005) (quoting *O'Shea*, 185 F.3d at 1098).

*circumstances*,"[60] and requires "careful consideration of the social context in which particular behavior occurs and is experienced by its target."[61]

By requiring a showing of a workplace permeated by severe or pervasive discriminatory conduct, the Supreme Court struck a balance between two extremes, creating "a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury."[62]  In so doing, the Supreme Court excluded from actionable conduct that which is "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing," because Title VII was not meant to be a "general civility code."[63]  "'[S]imple teasing,' . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"[64]  On the other hand, conduct need not be so severe or pervasive that it seriously affects a plaintiff's psychological well-being.[65]

Defendant argues that Giles's conduct was not objectively or subjectively severe or pervasive.  The allegations of physical contact are the two hair touching incidents and Giles's attempt to rub against Plaintiff once while they cleaned bathrooms.  There is a genuine dispute as to whether the hair touching incidents were consensual and whether they were sexual in nature. Some of Giles's statements to Plaintiff—such as calling her a bitch and telling her she stinks— are not sexual and seem to merely indicate some animosity between the two, but do not suggest a

---

[60]*Morris*, 666 F.3d at 664 (quoting *Harsco Corp.*, 475 F.3d at 1187).

[61]*Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).

[62]*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

[63]*Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

[64]*Id.* (citation omitted).

[65]*Nieto v. Kapoor*, 268 F.3d 1208, 1219 (10th Cir. 2001) (citation omitted).

severe or pervasive environment of harassment.  Other comments and actions, however, such as asking Plaintiff's husband how she tastes, asking Plaintiff whether she had been with a woman, asking her about her sex life, and making the "hu-hu-hu" noise and telling Plaintiff she had been practicing it all night or day for her, and wiping her crotch, are certainly more suggestive and some are explicitly sexual.  Although some might view such statements as "bickering and bantering" between employees, as Defendant argues, a reasonable jury could find that this conduct was sufficiently severe to create a hostile work environment.  In addition, Plaintiff's allegations that Cathy Butler Brown also made similar comments and on the occasion Plaintiff caught on video grabbed her crotch in Plaintiff's direction could lead a reasonable jury to believe that the harassment was pervasive.  Although Plaintiff does not give a clear picture of exactly how frequently these comments and actions occurred, she alleges that some of them occurred on a weekly basis or more frequently.

Although Plaintiff's work performance did not outwardly suffer, she experienced panic attacks that required her to stop working for short periods of time and sit in her custodial closet. This indicates that she subjectively experienced the harassment to be severe or pervasive.  As explained below, there is also a genuine issue of fact as to whether Plaintiff reported the harassment before February 2014, which calls into question Defendant's argument that she would have reported the harassment sooner if she had felt it to be subjectively severe or pervasive.

## 2.  Title VII Employer Liability

To succeed on her Title VII claim, Plaintiff must also show that PSU "had actual or constructive knowledge of the hostile work environment but did not adequately respond to notice

of the harassment."[66]  Defendant argues that Plaintiff did not report sexual harassment until

February 19, 2014, and in response to that report, Cindy Johnson conducted an investigation into

the complaint.  Plaintiff claims that she informed Malle of the harassment numerous times before

fall of 2013, but gives no specific dates or occasions when her alleged reports took place.  She

also claims that she told Malle and Endicott in September 2013 that Giles was sexually harassing

her.  Giles's deposition testimony indicates that she understood Plaintiff's complaints in the

September 2013 meeting to imply a complaint of sexual harassment.  But Endicott and Malle

both testified that they understood Plaintiff's allegations during that meeting to be of a general

conflict between Plaintiff and Giles, not of sexual harassment.  Neither Malle nor Endicott

possessed any notes in their files indicating that Plaintiff complained to them of sexual

harassment, nor did they report any allegations of harassment to Cindy Johnson.  Johnson

testified that the first she ever heard of Plaintiff's complaints was on February 19, 2014, when

Plaintiff showed her the video of Cathy Butler Brown.  There is thus a genuine dispute of fact

about when Plaintiff reported sexual harassment to PSU supervisors, and about whether PSU had

actual or constructive knowledge of her claims of harassment prior to February 2014.

Whether PSU's response to Plaintiff's report was adequate depends on when PSU had

notice of her complaint.  If Plaintiff complained to Malle repeatedly and reported sexual

harassment in September 2013, it would appear that PSU did not adequately investigate her

complaint since it did not begin an investigation until her February 2014 report.  If, on the other

hand, her first report of sexual harassment was on February 19, 2014, it will be a question for a

jury to determine whether the investigation conducted by Johnson was adequate.  Accordingly,

---

[66]*Harsco Corp.*, 475 F.3d at 1186 (quoting *Adler*, 144 F.3d at 673).

Defendant's motion for summary judgment is denied as to Plaintiff's claim of sexual harassment under Title VII.

### 3.  Title IX Employer Liability

For the same reasons, summary judgment must also be denied as to Plaintiff's Title IX sexual harassment claim.  To succeed on that claim, Plaintiff must show that PSU had actual notice of the discrimination and demonstrated deliberate indifference to it.[67]  This is a more stringent requirement than Title VII.  The evidence reveals a genuine dispute of fact as to whether PSU had actual notice of Plaintiff's complaint of sexual harassment before February 2014.  Therefore, summary judgment is denied as to Plaintiff's claim of sexual harassment under Title IX.

### iii.  Retaliation

In analyzing retaliation claims under both Title VII and Title IX, courts apply the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*.[68]  Under that framework, Plaintiff must establish a prima facie case of retaliation by demonstrating that (1) she engaged in protected opposition to discrimination; (2) a reasonable person would have found the challenged action materially adverse; and (3) there is a causal connection between the protected activity and the materially adverse action.[69]  If the plaintiff establishes the prima facie case, the burden shifts to the employer to offer a legitimate non-retaliatory reason for the adverse employment action.[70]

---

[67] *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

[68] 411 U.S. 792 (1973); *C.T. v. Liberal Sch. Dist.*, 562 F. Supp. 2d 1324, 1336 (D. Kan. 2008).

[69] *C.T.*, 562 F. Supp. 2d at 1336.

[70] *McDonnell Douglas*, 411 U.S. at 802.

If the employer is able to offer a legitimate non-retaliatory reason, the burden shifts back to the plaintiff to show that the employer's stated reason is a pretext for discrimination.[71]

There is no dispute here that Plaintiff engaged in protected opposition to discrimination when she reported sexual harassment, although the date she reported such harassment is in dispute, as noted above.  The salient question is whether Plaintiff suffered an adverse employment action.  Plaintiff claims she suffered three adverse employment actions: First, she claims that PSU acquiesced in coworker retaliation against Plaintiff by failing to discipline Giles for harassment.  Second, she claims that being required to clock out after Giles meant that she worked later than she was supposed to, and was not paid overtime for her work.  Third, she contends that she was disciplined for discriminating against Giles, in retaliation for her claims of sexual harassment.

Plaintiff contends that PSU acquiesced in harassment against her in two ways.  She argues that Malle and Endicott acquiesced in harassment by Giles when they did not discipline Giles for throwing her sunglasses at Plaintiff, challenging Plaintiff to a fight, and using profanity towards Plaintiff during the September 2013 meeting and the altercation that preceded it.  She argues that they and Johnson also knew that on February 21, 2014, McGowan came to the Foxes' house while Giles was in her car down the street, but said they could not do anything about conduct that occurred off-campus.

In order for co-worker hostility or retaliatory harassment to be considered intentional retaliation by the employer, "supervisory or management personnel [must] either (1) orchestrate the harassment or (2) know about the harassment and acquiesce in it in such a manner as to

---

[71]*Id.* at 804.

condone and encourage the co-worker's actions."[72]  On the other hand, "[a]n employer may not be held liable for the retaliatory acts of co-workers if none of its supervisory or management-level personnel orchestrated, condoned, or encouraged the co-workers' actions . . . ."[73]  Here, no reasonable jury could find that PSU management personnel orchestrated or condoned retaliatory harassment by Plaintiff's co-workers.  Endicott and Malle held a meeting immediately in September 2013 after hearing Giles yelling at Plaintiff.  During that meeting, they did not condone Giles's actions, but discussed Plaintiff's complaints with her and Giles and attempted to diffuse the situation.  No reasonable jury could find that their actions amounted to condoning or encouraging Giles's behavior.  Similarly, no reasonable jury could find that Malle and Endicott's response when the Foxes told them that McGowan came to their house amounted to encouragement of McGowan's behavior or disregard for Plaintiff's complaint.  Rather, they expressed their belief that they could not discipline Giles for behavior by her girlfriend that occurred outside of the workplace.  Furthermore, although Giles was in her car down the street during the interaction between Rick Fox and McGowan, any retaliatory behavior during this interaction was by McGowan, who was not a PSU employee and over whom Malle and Endicott had no authority.  Therefore, it is clear that PSU did not acquiesce to retaliation by Plaintiff's co-workers such that this constitutes an adverse employment action.

Plaintiff also contends that she suffered an adverse employment action in that she was required to clock out after Giles, which meant that she worked later than she was scheduled to work and was not paid overtime.  This contention is unavailing.  Both Endicott and Plaintiff herself testified that Endicott *suggested* that Plaintiff avoid seeing Giles at the time clock by

---

[72]*Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1265 (10th Cir. 1998).

[73]*Id.*

clocking out after Giles.  There is no evidence to suggest that this was a requirement or a punishment.  Plaintiff requested a way to avoid interacting with Giles and Endicott offered a solution, but the evidence does not support Plaintiff's contention that it was a command.  No reasonable jury could find that Endicott's suggestion that Plaintiff clock out after Giles was an adverse employment action.[74]

Finally, Plaintiff contends that Johnson's finding that Plaintiff discriminated against Giles was disciplinary action amounting to an adverse employment action.  The evidence does not support this argument.  Plaintiff suggests that the finding of discrimination was baseless because Johnson could not articulate a basis for her finding.  This suggestion is contrary to the evidence.  Johnson articulated in her deposition that the basis for her finding was the statements Plaintiff made to Giles at the September 2013 meeting, which all listeners interpreted to be about Giles's sexual orientation.  Plaintiff also speculates that Johnson's finding amounts to a "write up," equivalent to a negative evaluation or a warning.  The evidence does not support this characterization.  Michele Sexton's affidavit explaining PSU's policies indicates that the finding does not amount to a disciplinary action, and no documentation about Johnson's findings or investigation is in Plaintiff's employee file.  Rather, Johnson's letter to Plaintiff merely explains the results of her investigation.  Plaintiff's speculation that the letter could be in her file or affect future employment is not supported by the evidence in the case.  The Court thus finds that Johnson's finding that Plaintiff discriminated against Giles in the September 2013 meeting on the basis of Giles's sexual orientation is not an adverse employment action.

Because the Court finds that Plaintiff did not suffer an adverse employment action, PSU is entitled to summary judgment on Plaintiff's claims of retaliation under Title VII and Title IX.

---

[74]In addition, the evidence shows that Plaintiff worked a total of 25 minutes past 10:00 PM, the time her shift ended, over the course of the entire time she was clocking out after Giles.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's motion for summary judgment (Doc. 111) is granted in part and denied in part.  The motion is granted as to Plaintiff's retaliation claims and denied as to Plaintiff's sexual harassment claims.

**IT IS FURTHER ORDERED** that Plaintiff's motion to exclude expert testimony (Doc. 104) is granted.

**IT IS SO ORDERED.**

Dated: August 17, 2016

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE