# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MARTHA FOX,

      Plaintiff,

      v.                                    Case No. 14-CV-2606-JAR

PITTSBURG STATE UNIVERSITY,

      Defendant.

## MEMORANDUM AND ORDER

A jury rendered a verdict in favor of Plaintiff Martha Fox on claims for damages arising under Title VII and Title IX against Defendant Pittsburg State University ("PSU"), and the Court entered judgment on the verdict. The parties have now filed post-trial motions.[1] The motions are fully briefed and the Court is prepared to rule. For the reasons explained more fully below, the Court **denies** Defendant's Motion for Renewed Judgment as a Matter of Law as to the Title IX Claim (Doc. 207) and **denies** Defendant's Motion for Renewed Judgment as a Matter of Law as to the Title VII Claim (Doc. 209). The Court also **denies** Defendant PSU's Motion For New Trial or in the Alternative for Remittitur (Doc. 214).

Notably, Defendant improperly filed separate motions for judgment as a matter of law as to each claim, effectively circumventing the page limitations. It is not in compliance with the Federal Rules of Civil Procedure or the local rules, which contemplate one filing for all claims.[2] Defendant should have filed *one* motion for judgment as a matter of law as to both claims and requested leave to extend the page limitation if necessary. The Court deliberated about whether

---

[1] The Court will consider Plaintiff's motion for attorneys' fees and expenses (Doc. 211) in a separate order.

[2] *See* Fed. R. Civ. P. 50(b) (referring to motion in the singular throughout the rule); D. Kan. R. 7.1(e) (requiring briefing to not exceed 30 pages without leave of the Court).

to strike the motions, but ultimately decided to consider both. Defendant was represented by experienced counsel, Ms. Casement and Ms. Willoughby, who undoubtedly knew this was a violation of the local rule and that it would create an excessive amount of work for Plaintiff's counsel as well as this Court. In fact, Defendant has single-handedly multiplied the briefing, advanced an inordinate number of arguments, many of which are without merit, and seeded its briefing with vexatious, inappropriate, uncivil and unprofessional language, as will be detailed in the Court's order on Plaintiff's attorney fees and expenses. None of Defendant's tactics is well received by the Court.

## I.     Background

This matter arose out of Plaintiff's employment as a custodian at PSU between July 2010 and November 2015. Plaintiff contends that she was subjected to sexual harassment from April 2012 to March 2014 by Custodial Supervisor Jana Giles and custodian Cathy Butler Brown. Plaintiff complained to members of the custodial management, including Wanda Endicott and Kevin Malle, but nothing was done to stop or deter the conduct.

In February 2014, Plaintiff complained about the ongoing sexual harassment to Cindy Johnson, PSU's Director of Equal Opportunity and Affirmative Action. Plaintiff alleges Defendant failed to properly investigate the complaints in that Johnson refused to interview witnesses. Johnson told Plaintiff that she would not investigate Plaintiff's complaints because Johnson feared it would start a "firestorm." Plaintiff alleges that she did not receive sexual harassment training until after the alleged harassment took place. Plaintiff also alleges she suffered emotional distress damages as a result of the sexual harassment she endured.

Defendant filed a motion for summary judgment on the Title IX and Title VII sexual harassment and retaliation claims. The Court denied summary judgment on the Title IX and

Title VII hostile work environment sexual harassment claims, but granted summary judgment on the Title VII and Title IX retaliation claims. The case proceeded to a jury trial on October 3, 2016 on the remaining claims. The jury returned a verdict in favor of Plaintiff on both claims, awarding damages of $100,000 on the Title IX claim, and $130,000 on the Title VII claim. The Court denied Defendant's oral and written motions under Federal Rule of Civil Procedure 50(a) for judgment as a matter of law,[3] and entered judgment on the verdict in favor of Plaintiff and against Defendant.[4]

## II. Motion for Judgment as a Matter of Law

### A. Standard

A district court may grant a motion for judgment as a matter of law under Rule 50 if it "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on [the] issue."[5] The standard is met only when "the proof is all one way or so overwhelmingly preponderant in favor of the movant as to permit no other rational conclusion."[6] In determining whether judgment as a matter of law is proper, a court may not weigh the evidence, consider the credibility of witnesses, or substitute its judgment for that of the jury.[7] In other words, the Court must affirm a jury verdict if, viewing the record in the light most favorable to the nonmovant, the record contains evidence upon which the jury could properly return a verdict for the nonmovant.[8] Judgment as a matter of law is appropriate "[i]f there is no

---

[3] Doc. 196.

[4] Doc. 197.

[5] Fed. R. Civ. P. 50(a).

[6] *Crumpacker v. Kan. Dep't of Human Res.*, 474 F.3d 747, 751 (10th Cir. 2007).

[7] *See Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 891 (10th Cir. 2006).

[8] *See Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 914 (10th Cir. 2004).

legally sufficient evidentiary basis . . . with respect to a claim or defense . . . under the controlling law."[9]

**B.      Discussion**

The Court addresses the motions for judgment on the Title IX and Title VII claims separately, as the parties have done in the briefing.

**1.      Title IX Claim**

Defendant moves for judgment as a matter of law on the Title IX claim for four reasons—(1) Plaintiff does not have a private right of action under Title IX as a custodian; (2) Defendant is immune from Plaintiff's Title IX claim; (3) Plaintiff failed to meet the standard for damages under Title IX; and (4) Plaintiff provided insufficient evidence of actual notice to the proper authority.  Inexplicably, Defendant did not raise the first two grounds in its summary judgment motion, but argues that because these are jurisdictional issues, they can be raised at any time.  Each argument will be addressed in turn.

**a.      Private Right of Action**

Plaintiff invoked both Title VII and Title IX at trial to seek relief for the hostile work environment sexual harassment she faced based on her sex.  Defendant argues that Title IX does not grant a private right of action to a custodial employee.  This argument is twofold.  First, Defendant argues that Title IX is "preempted" in the context of employee-on-employee sexual harassment by Title VII. [10]   Second, even if Title VII does not displace relief under Title IX,

---

[9] *Baty v. Willamette Indus., Inc.*, 172 F.3d 1232, 1241 (10th Cir. 1999) (quoting *Harolds Stores, Inc. v. Dillard Dep't Stores*, 82 F.3d 1533, 1546–47 (10th Cir. 1996)).

[10] As the Third Circuit recognized, preemption is a doctrine that normally relates to the relationship between state and federal law. *See Kazar v. Slippery Rock Univ.of Pa.*, No 16-2161, 2017 WL 587984, at *5 n.5 (3d Cir. Feb. 14, 2017).  Preemption, therefore, is not the proper term to describe the relationship between Title VII and Title IX, which are both federal law. Rather, the issue is whether these federal laws displace each other.  The Court will refer to this theory as displacement throughout the order for purposes of clarity.

there is no implied private right of action for employee-on-employee sexual harassment where, as here, the employee does not have any relation to an educational program or activity.

### i.     Waiver

As to the "preemption" argument, Plaintiff argues this has been waived because it was not raised in the Rule 50(a) motion made at trial.  Although inartfully drafted, the Court believes that Defendant's response is that this is "jurisdictional" in nature, so it cannot be waived and may be raised at any time.  The general rule is that "[a] party may not circumvent Rule 50(a) by raising for the first time in a post-trial motion issues not raised in an earlier motion" for judgment as a matter of law.[11]  However, under Federal Rule of Civil Procedure 12(h)(3), a party may raise a challenge to subject matter jurisdiction at any time.  Given the complete lack of authority and the novelty of this issue, the Court will assume without deciding that "preemption" is "jurisdictional" and may be raised for the first time in a Rule 50(b) motion.

### ii.     Title VII Displacing Relief Under Title IX

The Court finds that even if Defendant's argument that Title VII displaces Title IX has not been waived, it is without merit.  The issue of whether Title VII displaces relief under Title IX to recover damages for employment discrimination is unsettled.[12]  The parties do not cite nor is the Court aware of Tenth Circuit precedent addressing whether Title VII displaces Title IX in the employment discrimination context.  But there is a split of authority among other circuits that

---

[11] *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1228 (10th Cir. 2000); *see* Fed. R. Civ. P. 50(a)–(b).

[12] Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2 (1998).

Title IX was passed to address the growing problem of sex discrimination in educational programs.  *See* 118 Cong. Rec. 5804-15 (1972); H.R. Rep. No. 554, 92d Cong., 1st Sess. 1-3 (1972).  Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

have addressed the issue of whether a Title VII claim displaces relief under Title IX. As explained in more detail below, this Court finds more persuasive the reasoning of those circuit courts that have held that Title VII does not displace Title IX.

There are six Supreme Court decisions guiding this Court's conclusion that Title VII does not displace Title IX.[13] Most relevant to this case, in *Jackson v. Birmingham Board of Education*, a high school employee was relieved of his coaching position when he complained of disparate treatment of the girls' basketball team.[14] The Supreme Court recognized an employee's private right of action for retaliation under Title IX despite no express prohibition in the statute because if the funding recipient were "permitted to retaliate freely," "individuals" who witness sex discrimination would be "loath to report it" and "all manner of Title IX violations might go unremedied."[15] Though not explicitly addressed, the Supreme Court did not indicate that Title VII displaced relief under Title IX. Rather, the Supreme Court recognized "Title VII is a vastly different statute," as it distinguished Title IX's "broadly written general prohibition on

---

[13] In *Johnson v. Railway Express Agency, Inc.*, the Supreme Court explained a private-sector employee "clearly is not deprived of other remedies" and is not "limited to Title VII in search for relief." 421 U.S. 454, 459 (1975). By contrast, in *Brown v. General Services Administration*, the Court recognized an amendment to Title VII (42 U.S.C. § 2000e-16) that waived sovereign immunity for *federal* employees' access to relief from workplace discrimination was the "exclusive" remedy for *federal* employment discrimination claims. 425 U.S. 820, 829 (1976). Importantly, the Court noted that this was unlike *Johnson* because *Johnson* held only that Title VII does not displace other remedies in *private* employment discrimination. *Id.* at 833. In *Cannon v. University of Chicago*, the Supreme Court held that there was an implied private right of action for victims of sex discrimination by universities receiving federal funding. 441 U.S. 677, 703–10 (1979) (applying Title IX to applicant of medical school that was rejected based on sex notwithstanding that Title IX does not "expressly authorize" a private right of action). In *North Haven Board of Education v. Bell*, the Supreme Court clarified that Title IX's prohibition of sex discrimination applied not only to students, but also to "[e]mployees who directly participate in federal programs or who directly benefit from federal grants, loans or contracts," thereby broadening the scope of Title IX to include employment discrimination. 456 U.S. 512, 520 (1982). *North Haven* recognized Congress provided a "variety of remedies, at times overlapping, to eradicate" private-sector employment discrimination. *Id.* at 535 n.26. In *Franklin v. Gwinnett County Public Schools*, the Court held that money damages were available for a student-plaintiff filing an action for sexual harassment under Title IX. 503 U.S. 60, 72–76 (1992) (resolving circuit split and "conclud[ing] that a damages remedy is available for an action brought to enforce Title IX").

[14] 544 U.S. 167, 171 (2005).

[15] *Id.* at 180.

discrimination" with Title VII's "greater detail [with respect to] the conduct that constitutes discrimination."[16]

The circuits have split on whether Title VII is intended to displace Title IX for claims against schools in the employment discrimination context. In *Lakoski v. James*, the Fifth Circuit held that Title VII displaces Title IX because allowing Title IX employment discrimination claims to proceed without satisfying Title VII's exhaustion requirements would upset Congress's remedial scheme for redressing employment discrimination.[17] In *Lakoski*, the plaintiff, a former professor denied tenure, argued that based on *Cannon*, *North Haven*, and *Franklin*, there was an implied right of action under Title IX for employment discrimination.[18] The Fifth Circuit disagreed with this "jurisprudential arithmetic," distinguishing *Cannon* and *Franklin* as related to claims of prospective or current students, and *North Haven* as unrelated to the validity Title VII.[19] In reaching its conclusion, the Fifth Circuit observed that "Congress enacted Title IX only months after extending Title VII to state and local governmental employees," and remarked "[t]hat Congress intend[ing] to create a bypass of Title VII's administrative procedures so soon after its extension to state and local employees is an extraordinary proposition."[20] Thus, the Fifth Circuit refused to do "violence to the congressionally mandated procedures for Title VII," and held it was error to submit Plaintiff's Title IX claim to the jury.[21] The Seventh Circuit has held similarly.[22] But both opinions pre-dated *Jackson*.

---

[16] *Id.* at 175 (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 283–84, 286–87 (1998)).

[17] 66 F.3d 751, 754 (5th Cir. 1995).

[18] *Id.* at 754.

[19] *Id.*

[20] *Id.* at 756.

[21] *Id.* at 754.

[22] *See Waid v. Merrill Area Pub. Sch.*, 91 F.3d 857, 862 (7th Cir. 1996).

By contrast, the Fourth Circuit in *Preston v. Commonwealth of Virginia ex rel. New River Community College* held that retaliatory employment discrimination may be sought under Title IX and Title VII.[23]  The Fourth Circuit reasoned Title VII and its judicial interpretations provide a persuasive body of standards to which courts may look in shaping contours of private rights of action under Title IX.[24]  Thus, the Fourth Circuit concluded that "[a]n implied private right of action exists for enforcement of Title IX . . . [which] extends to employment discrimination on the basis of gender by educational institutions receiving federal funds."[25]  The Sixth Circuit and the First Circuit have held similarly.[26]

In March 2017, in *Doe v. Mercy Catholic Medical Center*, the Third Circuit held that Title IX and Title VII had concurrent applicability and that Title VII does not displace Title IX employment discrimination claims.[27]  The Third Circuit looked to the six Supreme Court decisions discussed above to guide its decision.[28]  From these six decisions, it derived four guiding principles.  One, private-sector employees are not limited to Title VII in their search for relief from workplace discrimination.[29]  Two, it is a matter of policy left for Congress's constitutional purview whether an alternative avenue of relief from employment discrimination

---

[23] 31 F.3d 203, 207 (4th Cir. 1994).

[24] *Id.*

[25] *Id.* at 205–06.

[26] *Ivan v. Kent St. Univ.*, No. 94-4090, 1996 WL 422496, at *3 n. 10 (6th Cir. 1996) (overruling district court conclusion that Title VII displaces an individual's private remedy under Title IX); *accord Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 896–97 (1st Cir. 1988).

[27] 850 F.3d 545, 563 (3d Cir. 2017).  The Court notes that this case involved a medical resident.  Defendant, in briefing, suggests that medical residents are students.  However, the Court still finds these cases as applicable in the employment discrimination context because the courts often consider the medical residents as employees or employee-student mix.

[28] *Id.* at 560 (citing *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454 (1975); *Brown v. Gen. Servs. Adm.*, 425 U.S. 820 (1976); *Cannon v. Univ. of Chi.*, 441 U.S. 677 (1979); *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512 (1982); *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60 (1992); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005)).

[29] *Mercy Catholic Med. Ctr.*, 850 F.3d at 562.

might undesirably allow circumvention of Title VII's administrative requirements.[30]  Three, the provision implying Title IX's private cause of action, 20 U.S.C. § 1681(a), encompasses employees, not just students.[31]  Four, Title IX's implied private cause of action extends to employees of federally funded education programs who allege sex-based retaliation claims under Title IX, and no subsequent decision of the Supreme Court has narrowed this principle.[32]  The Fourth Circuit declined to follow the Fifth and Sixth Circuit decisions because they "did not address the Supreme Court's decisions in *Johnson* and *Brown* and the provisions of *North Haven* rejecting 'policy'-based rationales" and "were decided a decade before the Supreme Court handed down *Jackson*, which explicitly recognized an employee's private claim under *Cannon*."[33]  Thus, the plaintiff was entitled to relief under Title IX and Title VII.[34]

        This Court will follow the approach of the majority—the First, Third, Fourth, and Sixth Circuits— that Title VII and Title IX have concurrent applicability in employment

---

[30] *Id.*

[31] *Id.* (citing *N. Haven*, 456 U.S. at 520; *Cannon*, 441 U.S. at 694).

[32] *Id.* at 562–63 (citing *Jackson*, 544 U.S. at 171).

[33] *Id.*

[34] *Id.*; *see also Kazar v. Slippery Rock Univ. of Pa.*, No 16-2161, 2017 WL 587984 (3d Cir. Feb. 14, 2017). The Third Circuit opinion assumed without deciding that Title IX may be used to bring an employment discrimination claim.  However, Judge Shwartz wrote in concurrence to provide an analysis of the Supreme Court precedent relevant to whether Title VII displaces Title IX.  *Id.* at *7–8 (Shwartz, J., concurring).  Judge Shwartz noted first, the Supreme Court recognized in *North Haven Board of Education v. Bell* that Title IX covers employment discrimination, and in *Cannon v. Chicago*, it recognized that there is a private right of action for employment discrimination.  456 U.S. 512, 525, 535–36 (1982); 441 U.S. 677, 696 (1979).  Second, the Supreme Court recognized in *Johnson v. Railway Express Agency Inc.* that Title VII was not the exclusive remedy for employment discrimination.  421 U.S. 454, 459 (1975).  Third, the Supreme Court has recognized that Title IX and Title VII are vastly different statutes.  *Kazar*, 2017 WL 587984, at *7 (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005)) (noting the difference in offenders, statute of limitations, remedies, and goals of the statutes).  Fourth, because many circuits apply Title VII standards to Title XI cases, there is a recognized parity between Title VII and Title IX.  *Id.*  Fifth, although the Supreme Court has held that Congress's enactment of a comprehensive scheme to address a problem may demonstrate "congressional intent to preclude" seeking remedies via other statutes, that principle was not applicable to Title IX because Title IX was enacted after Title VII.  *Id.* at *8.  Thus, Judge Shwartz ultimately concluded that Title VII did not displace Title IX for recovery in the employment discrimination context.

discrimination claims.[35]  Reading the six Supreme Court cases outlined above together, this Court is persuaded that there is a private right of action for employees of educational institutions receiving federal funding under both Title VII and Title IX.  If Congress intended for Title VII to displace employment discrimination claims under Title IX, it could have drafted Title IX, which was enacted *following* Title VII, to state as much.[36]  Instead, Title IX broadly covers any "person," not just students, alleging discrimination.  The Supreme Court has already rejected the argument that Title VII is the exclusive remedy for employment discrimination actions, so the argument that Title IX employment discrimination claims may circumvent the Title VII scheme is rejected.[37]  Further, while Title VII and Title IX are often called analogous or similar, the two statutes are not identical.  The Court declines to infer any preference for recovery under Title VII without a more definite expression from Congress[38]—for example, a provision in Title VII barring concurrent private Title IX claims.  Accordingly, Title VII does not displace employment discrimination claims pursuant to Title IX.

---

[35] This position is also consistent with the holdings of a number of recent district court cases.  *See, e.g.*, *Winters v. Pa. St. Univ.*, 172 F. Supp. 3d, 774–75 (M.D. Pa. 2016) (holding Title VII did not displace sex discrimination claim brought under Title IX by male former university professor terminated following sexual harassment investigation); *Russell v. Nebo Sch. Dist.*, No. 16-00273, 2016 WL 4287542 (D. Utah Aug. 15, 2016) (concluding Title VII does not displace Title IX in Title IX employment discrimination case alleging sexual harassment).  *Contra Uyar v. Seli*, No. 16-186, 2017 WL 886934, at *6 (D. Conn. Mar. 6, 2017) (holding Title VII was the plaintiff's exclusive remedy for sexual harassment and dismissing Title IX claims following precedent in *Urie v. Yale Univ.*, 331 F. Supp. 2d 94, 97–98 (D. Conn. 2004)).

[36] This is only further propounded by subsequent amendments to Title VII eliminating an exemption for higher education employees from pursuing a Title VII claim.  As the Supreme Court explained in 1990 in *University of Pennsylvania v. EEOC*, 493 U.S. 182, 189–90 (1990) (citations omitted), when Title VII was enacted originally in 1964, it exempted an "educational institution with respect to the employment of individuals to perform work connected with the educational activities of such institution."  Eight years later, Congress eliminated that specific exemption by enacting § 3 of the Equal Employment Opportunity Act of 1972, 86 Stat. 103.  This extension of Title VII was Congress' considered response to the widespread and compelling problem of invidious discrimination in educational institutions.

[37] *See Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459 (1975) ("Despite Title VII's range and its design as a comprehensive solution for the problem of invidious discrimination in employment, the aggrieved individual clearly is not deprived of other remedies he possesses and is not limited to Title VII in his search for relief.  The legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes.") (citation omitted).

[38] *Mercy Catholic Med. Ctr.*, 850 F.3d at 564 (citing *Johnson*, 421 U.S. at 461).

This Court is further persuaded that this is the approach that would be taken by the Tenth Circuit given that the Tenth Circuit applies Title VII principles to Title IX employment discrimination actions.[39] As the Tenth Circuit has noted, Title VII is "the most appropriate analogue when defining Title IX's substantive standards."[40] In fact, as recently as June 2017, the Tenth Circuit in *Hiatt v. Colorado Seminary* applied Title VII standards to hybrid Title VII and Title IX retaliation claims by a university faculty member.[41]

Nothing leads this Court to believe that Title VII is meant to be the "exclusive" remedy for employment discrimination. Further, nothing leads this Court to believe that Title VII is meant to displace Title IX, as the Tenth Circuit has recognized that these causes of action are "analogous," not identical. While the two statutes address similar conduct, there are still differences, including "target[ing] different offenders, hav[ing] different statutes of limitations, and provid[ing] some different remedies."[42] By recognizing that Title VII standards apply to Title IX employment claims, the Tenth Circuit has implicitly recognized that Title VII does not displace Title IX to address employment discrimination.

### iii.    Nexus to Educational Programs or Activities for Title IX

The Court next addresses Defendant's alternative argument that Plaintiff must show her work has a "nexus" to education in order to qualify for Title IX's remedies. Defendant argues that this "nexus" is a requirement for employment discrimination actions following the 1987 amendment to Title IX. The 1987 amendment to Title IX was in response to prior holdings of the Supreme Court limiting its reach to only programs that received federal funding. In 1982, in

---

[39] *See Roberts v. Colo. St. Bd. of Agric.*, 998 F.2d 824, 832 (10th Cir. 1993); *Mabry v. St. Bd. of Comm. Colls. & Occupational Educ.*, 813 F.2d 311, 316 n.6 (10th Cir. 1987).

[40] *Roberts*, 998 F.2d at 832.

[41] --F.3d--, No. 16-1159, 2017 WL 2384732, at *6 n.8 (10th Cir. June 2, 2017).

[42] *Kazar*, 2017 WL 587984, at *7.

*North Haven*, the Supreme Court held that Title IX's prohibition of sex discrimination of students and employees, but only employees who directly participated in federal programs or directly benefitted from federal grants, loans or contracts.[43]  The Supreme Court noted that Congress had not adopted a proposal that would have prohibited "*all* discriminatory practices of an institution" receiving federal funds.[44]  Further, in 1984, in *Grove City College v. Bell*, the Supreme Court interpreted Title IX's phrase "education program or activity" to only apply to the particular programs receiving federal funding.[45]

In response to these holdings narrowing the scope of Title IX protection, Congress enacted the Civil Rights Restoration Act of 1987.[46]  The amendment sought to clarify §1681(a), which reads that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  The amendment to Title IX specified that the term "program" as used in § 1681 means "all of the operations of" the institution that received federal funding, regardless of whether the specific program at issue benefitted from that funding.[47]  Indeed, the Senate Report addressing the Civil Rights Restoration Act of 1987 clarified that discrimination is "prohibited throughout *entire* agencies or institutions if any part receives Federal financial assistance,"[48] and that "all of the operations of" an educational

---

[43] *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 520 (1982).

[44] *Id.* at 537 (emphasis in original).

[45] 465 U.S. 555, 574–75 (1984).

[46] Pub. L. 100-259, 102 Stat. 28.

[47] *See* 20 U.S.C. § 1687.

[48] S. Rep. No. 100-64, at 6 (1987) (emphasis added).  Defendant contends the legislative history is cited out of context.  It goes on to offer a statement of Senator Bayh in 1972 during the congressional debates over the bill containing Title IX.  118 Cong. Rec. 5803 (daily ed. Feb. 28, 1972).  He stated "[m]ore specifically, the heart of this amendment is a provision banning sex discrimination in educational programs receiving Federal funds.  The amendment would cover such crucial aspects as admissions procedures, scholarships, and *faculty employment*, with limited exceptions."  *Id.* (emphasis added).  Defendant emphasizes the word "faculty employment," yet fails to even

institution or system would include, but is not limited to: "traditional educational operations, faculty and student housing, campus shuttle bus service, campus restaurants, the bookstore, and other commercial activities."[49]  Overall, the amendment's purpose was to reaffirm pre-*Grove City College* judicial and executive branch interpretations and enforcement practices which provided for "broad coverage" of the anti-discrimination provisions of these civil rights statutes.[50]

The Court rejects Defendant's argument that the 1987 amendment to Title IX only decided the issue of whether the institution as a whole is covered, and that a plaintiff still needs to show that her work had a "nexus" to educational programs or activities.  Given Title IX's broad language, this position simply does not comport with the plain language of the statute— "*[n]o person* in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under *any* education program or activity receiving federal financial assistance."[51]  The Supreme Court has read "no person" broadly; as *North Haven* puts it so aptly,

> "[b]ecause § [1681(a)] neither expressly nor impliedly excludes employees from its reach, we should interpret the provision as covering and protecting these 'persons' unless other considerations counsel to the contrary.  After all, Congress easily could have substituted 'student' or 'beneficiary' for the word 'person' if it had wished to restrict the scope of § [1681(a)]."[52]

Further, the requirement of a nexus to "education" is not consistent with Title IX's broad purpose, which is "to avoid the use of federal resources to support discriminatory practices" and

---

acknowledge the words "limited exceptions" immediately following.  The Court finds this is not a limiting statement, but rather provides examples of some of the things that Title IX was seeking to protect.

[49] S. Rep. No. 100-64, at 17 (1987).

[50] S. Rep. No. 100-64, at 4 (1987).

[51] 20 U.S.C. § 1681(a) (emphasis added).

[52] *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982).

"provide individual citizens effective protection against those practices."[53]  Particularly, with the first purpose in mind, this seems to be an institution-wide objective that is not limited narrowly to university educational initiatives, as these institutions as a whole receive federal funding.

Moreover, many of the cases Defendant cites for the proposition that Plaintiff's work must relate to an educational program or activity are no longer of continued validity in light of the 1987 amendment.[54]  Further, nothing in the language or legislative history of the 1987 amendment suggests that Congress intended to limit Title IX's scope to only certain members of the university or intended to require a "nexus" to educational programs or activities.  Rather, Congress intended for Title IX to broadly cover the entirety of the institution, including "campus shuttle bus service, campus restaurants, the bookstore, and other commercial activities."[55]  Indeed, the word "broad" is used 35 times in the legislative history of the 1987 amendment alone.

Defendant also relies upon *Preyer v. Darmouth*,[56] a post 1987 district court decision that entirely misreads the 1987 amendment.  In *Preyer*, the court held that a college dining services employee could not maintain a sex discrimination under Title IX,[57]  because "in order to give effect to the word 'education,' the prohibition against sexual discrimination in § 1681(a) applies only to those operations of a college or university that are educational in nature or bear some relation to the educational goal of the institution."[58]  But, the district court's interpretation of the word "education" to only involve operations that are educational in nature contravenes

---

[53] *Cannon v. Univ. of Chi.*, 441 U.S. 677, 703 (1979).

[54] *See Walters v. President & Fellows of Harvard College*, 601 F. Supp. 867, 868 (D. Mass. 1985); *Urie v. Yale University*, 331 F. Supp. 2d 94, 97–98 (D. Conn. 2004).

[55] S. Rep. No. 100-64, at 17 (1987).

[56] 968 F. Supp. 20, 25 (D.N.H. 1997).

[57] *Id.*

[58] *Id.*

Congressional intent that Title IX reach "traditional educational operations, faculty and student housing, campus shuttle bus service, campus restaurants, the bookstore, and other commercial activities."[59]

The Court further rejects Defendant's suggestion that Congress intended for Title IX to distinguish the janitorial staff as any less a part of the university or deserving of protection than faculty. Defendant asks this Court to draw an arbitrary line that prohibits groundskeepers or maintenance workers from asserting Title IX claims but allows professors or teachers. Defendant ignores the fact that there are hundreds of different types of employees at a university or on a university campus, such as bus drivers, cafeteria workers, librarians, childcare workers, bookstore employees, docents at the university art museum, athletic directors, resident assistants at dorms, and student admissions recruiters. Nothing Defendant cites persuades this Court that Title IX is meant to allow claims by some of these employees but not all. Title IX must be given "a sweep as broad as its language."[60]

Lastly, Defendant conflates the issue of whether Title IX requires that an employee have a "nexus" to educational programs or activities and the issue of whether a student's action under Title IX requires a showing that there was a "systemic effect of denying the victim equal access to an educational program or activity" under *Davis v. Monroe County Board of Education*.[61] A student necessarily must show a "systemic effect of denying the victim equal access to an educational program or activity," to demonstrate that gender-oriented conduct rises to the level of actionable harassment under Title IX.[62] By Defendant's own admission, this would be a

---

[59] S. Rep. No. 100-64, at 17 (1987).

[60] *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982).

[61] 526 U.S. 629, 652 (1999).

[62] *Id.* at 651–53.

separate inquiry from an inquiry into whether Plaintiff's work has a "nexus" to educational programs or activities.

In any event, Defendant's argument is without merit. Defendant relies on cases that involve student sexual harassment under Title IX.[63] But, as the Court explained above, the Tenth Circuit holds that Title VII standards apply to Title IX employment discrimination cases,[64] and there is no indication that such a showing of systemic effect of denying access to educational programs or activities is required under Title VII. Indeed, such a requirement would render it impossible for teachers and other employees to get relief under Title IX although they are undoubtedly covered by Title IX given the Supreme Court's holding in *Jackson v. Birmingham Board of Education*.[65] Thus, the Court finds that Plaintiff need not make this showing.[66]

### b. Sovereign Immunity

Defendant also argues that it cannot be held liable for the Title IX claim because Congress did not intend to waive sovereign immunity of the states. Defendant contends that the state did not have "notice" of the particular type of lawsuit asserted here—"an implied right of action for money damages based on a claim of employment discrimination against a sovereign for alleged sexual harassment by a co-worker"—when it accepted federal funds more than five

---

[63] *See id.* (considering student sexual harassment claim); *J.M. ex rel. Morris v. Hilldale Indep. Sch. Dist. No. 1-29*, Nos. 08-7104, 08-7105, 2010 WL 3516730, at *4 (10th Cir. 2010) (considering student sexual harassment claim); *K.T. v. Culver-Stockton Coll.*, No 16-165, 2016 WL 4243965, at *6 (E.D. Mo. Aug. 11, 2016) (considering sexual harassment claim of student recruit); *Johnson v. Indep. Sch. Dist. No. 47*, 194 F. Supp. 2d 939, 946 (D. Minn. 2002) (considering student sexual harassment claim).

[64] *Mabry v. St. Bd. of Comm. Colls. & Occupational Educ.*, 813 F.2d 311, 316 n.6 (10th Cir. 1987) ("There is a well-developed body of case law concerning employment-related sex discrimination under Title VII; courts should turn to that case law for guidance if confronted with an employment-related allegation of discrimination under Title IX.").

[65] 544 U.S. 167 (2005). Any language reflecting a "systemic denial" of access to educational benefits is notably absent from the Title IX claim asserted in *Jackson* for employment retaliation.

[66] Admittedly, this Court improperly applied this standard in ruling on Defendant's Rule 50(a) motion, but as explained in Part II.B.1.c.i. below, Plaintiff did not respond to this argument at the Rule 50(a) stage and the Court now has the benefit of complete briefing on the issue.

years ago.[67]  Defendant argues that without notice, the state has not expressly consented to be sued under these circumstances.

Plaintiff argues that Defendant has waived this argument because it was not made in the Rule 50(a) motion.  While a party must raise all issues in its Rule 50(a) motion that it wishes to dispute in its Rule 50(b) motion,[68] the Court agrees with Defendant that jurisdictional arguments may be raised at any time.[69]  Because sovereign immunity is jurisdictional,[70] it cannot be waived.

Although this argument has not been waived, it is wholly without merit.  Pursuant to its power under section five of the Fourteenth Amendment, "Congress abrogated the States' Eleventh Amendment immunity under Title IX."[71]  This is codified at 42 U.S.C. § 2000d-7(a)(1), which provides that: "[a] State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of . . . title IX of the Education Amendments of 1972."  It further provides in subsection (a)(2) that "[i]n a suit against a State for a violation of a statute [including Title IX], remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State."  Because this Court has found that Plaintiff may properly bring a private right of action for employment discrimination under Title IX, Defendant may be sued for such a violation.

Defendant's argument that it was not on "notice" of a private right of action for employment discrimination based on alleged sexual harassment is also without merit.  Although

---

[67] Doc. 208 at 14.

[68] *See United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1228 (10th Cir. 2000); see Fed. R. Civ. P. 50(a)–(b).

[69] Fed. R. Civ. P. 12(h)(3).

[70] *Pueblo of Jemez v. United States*, 790 F.3d 1143, 1151 (10th Cir. 2015) ("The defense of sovereign immunity is jurisdictional in nature, depriving courts of subject-matter jurisdiction where applicable.").

[71] *Franklin v. Gwinnett Cty. Pub. Schs.*, 503 U.S. 60, 72 (1992).

outside the sovereign immunity context, in *Jackson*,[72] the Supreme Court rejected this argument

because "[f]unding recipients have been on notice that they could be subjected to private suits for

intentional sex discrimination under Title IX since 1979, when we decided *Cannon*."[73]  In short,

Plaintiff has an implied private right of action for money damages based on an employment

discrimination claim for alleged sexual harassment under Title IX.  Defendant, an entity of the

State of Kansas, has waived sovereign immunity to claims under Title IX as outlined in 42

U.S.C. § 2000d-7(a)(1)–(2).  Thus, Defendant is not immune.

  **c.**  **Denial of Access to Educational Benefits**

  Defendant further argues that Plaintiff's allegations of emotional distress were

insufficient for recovery of damages under Title IX because Plaintiff is required to show a denial

of access to educational programs or activities.  The Court briefly discussed its analysis of this

requirement in the context of Defendant's argument that Title VII displaces relief under Title IX,

concluding that in the employment discrimination context for purposes of Title IX sexual

harassment allegations, denial of educational benefits is not a required showing outside of

student sexual harassment claims.[74]  For purposes of clarification and analysis, the Court will

expand on the applicable case law to explain why this "denial of access" requirement in the

employment discrimination context under Title IX.

---

[72] In *Jackson v. Birmingham Board of Education*, the Supreme Court considered the issue of notice in the context of the Spending Clause's notice requirement. 544 U.S. 167, 181 (2005).  Private Title IX damages actions are available only if the funding recipient had adequate notice it could be liable for the conduct alleged.  *Id.* However, this Court finds the issue of notice for purposes of sovereign immunity and notice for purposes of Spending Clause are analogous.

[73] *Id*.

[74] *See supra* Part II.B.1.a.iii.

### i.     Case Law Applying Title VII Standards to Title IX

As a threshold matter, the Tenth Circuit holds that Title VII standards should be applied to a case of employment discrimination brought under Title IX,[75] finding "no persuasive reason not to apply Title VII's substantive standards regarding sex discrimination to Title IX suits."[76] The Tenth Circuit further elaborated that Title VII is "the most appropriate analogue when defining Title IX's substantive standards."[77]

Further, there is a body of case law applying Title VII's substantive standards to Title IX employment discrimination claims. For example, in *Doe v. Mercy Catholic Medical Center*, the Third Circuit considered whether the claims of a medical resident for Title IX retaliation, *quid pro quo* sexual harassment, and hostile work environment were cognizable.[78] First determining that there was a private right of action under Title IX,[79] the Third Circuit went on to hold that Title VII standards governed both the retaliation and *quid pro quo* sexual harassment standards arising under Title IX.[80] In fact, the Third Circuit applied *only one* Title IX substantive standard to the plaintiff's Title IX claims—the additional element of actual notice and deliberate indifference articulated in *Gebser v. Lago Vista Independent School District*.[81] This substantive standard is not applied to Title VII sexual harassment claims. The Third Circuit reasoned this

---

[75] *Mabry v. St. Bd. of Comm. Colls. & Occupational Educ.*, 813 F.2d 311 (10th Cir. 1987); *see also Gossett v. Okla. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001).

[76] *Mabry*, 813 F.3d at 316.

[77] *Id.* at 316 n.6 (citation omitted).

[78] 850 F.3d 545, 558 (3d Cir. 2017).

[79] *Id.* at 560–66.

[80] *Id.* at 563–66 (dismissing the hostile environment claim as time barred).

[81] 624 U.S. 274, 290 (requiring proof that an "official who at a minimum" had "authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf" had "actual knowledge of discrimination in the recipient's program" and failed to adequately respond).

Title IX standard must apply, given Title IX's Spending Clause origin, which requires "notice" of the conduct to the university.[82]

Notably absent from these cases is any requirement of denial of access to educational benefits. Indeed, as the Court previously discussed, if a claimant was required to show a denial of equal access to educational benefits, Title IX would not be applicable to employment discrimination. For even a teacher or professor, which Defendant seemingly concedes would be entitled to Title IX protection,[83] would not be able to demonstrate a denial of access to educational benefits within the meaning of *Davis v. Monroe County Board of Education*.[84]

Furthermore, Defendant's reliance on 34 C.F.R. § 106.51, a Department of Education regulation, is misplaced. This regulation provides a laundry list of employment benefits that cannot be denied on the basis of sex in an educational program or activity receiving federal financial aid, including broadly applying to "[a]ny other term, condition, or privilege of employment." Of course, this regulation is directly contrary to Defendant's position that Plaintiff must show a denial of access to "educational" benefits; nothing in this regulation limits the reach of Title IX to denial of educational benefits. In fact, the language "terms, conditions, or privileges of employment" as used in 34 C.F.R. § 106.51(b)(10) is directly lifted from Title VII.[85]

Finally, while the Court acknowledges that it applied the denial of access to educational benefits standard in ruling on the Rule 50(a) motion, the issue was not raised at that stage in the litigation as Plaintiff did not respond to the Rule 50(a) motion. With the benefit of extensive

---

[82] *Mercy Catholic Med. Ctr.*, 850 F.3d at 565–66.

[83] Doc. 245 at 6 ("Again, if a student or faculty member was experiencing discrimination within one of these operations, thus making it difficult or impossible for that student or educational employee to fulfill their educational goals, such student or faculty member's claim would be covered by Title IX.").

[84] 526 U.S. 629, 652 (1999).

[85] *See* 42 U.S.C. § 2000e-2(a)(1).

briefing in the Rule 50(b) context, the Court agrees with Plaintiff that the systemic effect of denying the victim access to educational programs or activities standard does not apply in the Title IX employment discrimination context.

### ii. Application of Title VII Severe or Pervasive Harassment Standard

While Plaintiff is not required to show a denial of access to educational benefits, Title VII sexual harassment standards dictate what constitutes denial of terms, conditions, or privileges of employment. "For sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment."[86] The applicable test for a hostile work environment has both an objective and subjective component.[87] In determining whether an objectively "severe or pervasive" hostile environment exists, the Tenth Circuit states "it is necessary to look at all the circumstances involved," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[88] The objective inquiry focuses on the perspective of a reasonable person in the plaintiff's position considering all the circumstances.[89] To determine whether the environment was sufficiently severe or pervasive, the court is not required to find that the offending conduct seriously affected the plaintiff's psychological well-being.[90] However, "'simple teasing,' . . . offhand comments, and isolated incidents (unless

---

[86] *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986); *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993).

[87] *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir. 2012).

[88] *Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005).

[89] *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012); *Fuggett v. Security Transp. Servs., Inc.*, 147 F. Supp. 3d 1216, 1232 (D. Kan. 2015).

[90] *Nieto v. Kapoor*, 268 F.3d 1208, 1219 (10th Cir. 2001) (citation omitted).

extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"[91]

There was sufficient evidence presented at trial that the harassment was sufficiently objectively "severe or pervasive" to change the terms or conditions of Plaintiff's employment. Jana Giles engaged in physical contact with Plaintiff, including hair touching incidents and Giles's attempt to rub against Plaintiff while Plaintiff was cleaning a bathroom stall. Although there was contrary evidence that the hair touching incident was consensual, Plaintiff testified that it was not. It is not the province of the Court to make credibility determinations. Viewing the evidence in the light most favorable to Plaintiff, the hair touching incidents were non-consensual.

Further, there was evidence of objectively severe or pervasive harassment. Giles made numerous sexually charged comments, including asking Plaintiff's husband how she tastes, asking Plaintiff about her sex life with her husband, asking Plaintiff if she had been with a woman, telling Plaintiff she could make her feel better than her husband, and making a "hu-hu-hu" noise to mimic the female orgasm while telling Plaintiff she had practiced all night for her. Giles also made sexually charged gestures toward Plaintiff, including wiping her crotch in front of her. Further, on at least one occasion, Giles sat and waited in Plaintiff's custodial closet in the dark, startling Plaintiff when she arrived. Giles greeted Plaintiff, saying Plaintiff had finally made it. Plaintiff video recorded Cathy Butler Brown wiping her crotch in front of Plaintiff and telling her to "picture this." Plaintiff testified that incidents of this nature happened on average two to three times per week starting in 2012. Viewing the evidence in the light most favorable to Plaintiff, there was sufficient evidence of an objectively hostile work environment from the perspective of a reasonable person in Plaintiff's position.

---

[91] *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

And, there was sufficient evidence of conduct that was subjectively severe or pervasive. Although Plaintiff need not prove psychological suffering to recover, she presented ample evidence that her psychological well-being suffered as a result of the environment at PSU. Plaintiff testified that the sexually harassing conduct of Giles and Butler Brown affected her health. She could not eat, felt sick, and felt "gross." She began having nightmares and had difficulty sleeping at night. During the day, she suffered from anxiety, experiencing her heart beating fast, sweating, and nausea. There was also evidence that while at work, Plaintiff would stop working for short periods of time and sit in her custodial closet, to cope with her anxiety. Plaintiff testified that after Giles started harassing her, she had to take an increased dosage of Xanax. While she had suffered panic attacks before the harassment started, Plaintiff testified that the panic attacks became more severe and that she ranked her anxiety as greater than 10 on a scale of 1 to 10 following the harassment. Plaintiff testified that she was "scared for her life."

Sandra Brown, a custodial supervisor senior at PSU, corroborated Plaintiff's testimony, describing how Plaintiff was "bubbly," "fun," and "talkative," before the alleged harassment began, but after it began, Plaintiff stopped talking to others, often cried, acted sad, and seemed depressed. Sandra Brown observed Plaintiff at work with a red nose and swollen eyes. Plaintiff's husband, Rick Fox, who also worked as a custodial specialist at PSU, testified that during the time period of the harassment, Plaintiff acted sad, cried herself to sleep, and lost weight. Viewing the evidence in the light most favorable to Plaintiff, there is sufficient evidence that the harassment was both objectively and subjectively severe or pervasive, and thus was actionable under Title IX.

### d. Actual Notice And Deliberate Indifference

Defendant's argument that there was insufficient evidence of actual notice to an appropriate person at PSU is threefold. First, Defendant argues that actual notice was not given to an appropriate person, namely Johnson, until February 2014. Second, if Endicott and Malle were appropriate persons to receive reports of sexual harassment, Plaintiff's statements were too vague to give them notice. Third, once charged with actual notice, PSU did not act deliberately indifferent to the allegations of sexual harassment.

To succeed on a Title IX claim, the Supreme Court has held that a claim for money damages based on sexual harassment may arise under Title IX only if (1) "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [funding] recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond," and (2) the inadequate response "amount[s] to deliberate indifference to discrimination."[92] Schools cannot be held vicariously liable for acts of sexual harassment committed on campus.[93] Instead, schools are liable under Title IX for only their own misconduct, and not just any type of misconduct.[94] The school must be found to have acted with legal culpability known as deliberate indifference.[95] This rule imposes liability only on schools that choose to ignore Title IX's mandates.[96]

First, the Court finds that Johnson, PSU's Director of Equal Opportunity and Affirmative Action, was not the only appropriate person to report the sexual harassment to in order to put the university on notice. Indeed, the Tenth Circuit rejects the notion of determining the "appropriate

---

[92] *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

[93] *Escue v. N. Okla.. Coll.*, 450 F.3d 1146, 1152 (10th Cir. 2006).

[94] *See id.*

[95] *See id.*

[96] *Murrell v. Sch. Dist. No. 1 Denver, Colo.*, 186 F.3d 1238, 1247 (10th Cir. 1999).

person" based on job title alone.[97]  And, it is not the standard that victims of sexual harassment must notify the Title IX coordinator or human resources representative to appropriately be considered to have put the university on actual notice.  Rather, the Tenth Circuit determines the appropriate person based on whether the position had the ability to halt the sexual abuse.[98] While it is undisputed that Johnson had the power to halt the abuse, she  had no power to fire, discipline, or reprimand based on sexual harassment allegations.  She testified that she was not a "disciplinarian" and only could "make recommendations."  Johnson was an appropriate person, but not the only appropriate person.

Second, the Court finds Malle and Endicott were among the appropriate persons to whom to report sexual harassment for purposes of Title IX liability.  In *Murrell v. School District Number 1 of Denver, Colorado*, the Tenth Circuit clarified that "appropriate persons" to report to for the purposes of Title IX liability depends on whether they exercised control over the harasser and depends on the context in which the harassment occurred.[99]  While the Tenth Circuit held the principal of the school was considered an appropriate person, it also acknowledged that the "highest-ranking administrator" was not the only person for which Title IX liability could attach.[100]  The Tenth Circuit "decline[d] simply to name job titles that would or would not adequately" satisfy the "appropriate person" standard.[101]  Instead, it explained that this was necessarily a fact-based inquiry, focused on whether the official had the authority to halt known

---

[97] *Id.* at 1247.

[98] *Id.*

[99] *Id.* at  1248.

[100] *See id.* at 1247–48.

[101] *Id.* at 1247.

abuse.[102]  Defendant cites a number of cases requiring the appropriate person to have

responsibility over the entire operation of the school,[103] but this is not the standard the Tenth

Circuit has annunciated.  Rather, the person needs to have authority to institute corrective

measures.[104]

Malle, the physical plant supervisor and direct supervisor of Plaintiff, Giles, and Butler

Brown, exercised control over their schedules and assignments.    While Malle did not have the

power to fire or suspend, he was in charge of evaluating employees and had authority to issue

verbal reprimands, as part of PSU's progressive disciplinary system.  Malle was also considered

the shift supervisor, so complaints were to be lodged with him; and Malle testified that he would

take notes on such complaints.  Malle further testified that allegations of sexual harassment were

considered an exception to the progressive discipline system, and that he had a duty to report

such allegations to Johnson for investigation.  Nonetheless, there was evidence that Malle gave a

verbal reprimand to Butler Brown following the incident where she grabbed her crotch and said

"picture this" to Plaintiff.  Indeed, Defendant had PowerPoint[105] and training materials on hostile

work environment, which was used to train faculty and staff.  These materials stated that

if an employee was feeling harassed, he or she must "[r]eport the behavior to someone who is

authorized to take action to stop the harassment such as your supervisor . . . ."[106]  Malle had

---

[102] *Id.* (providing the example of halting abuse through "transferring the harassing student to a different class, suspending him, curtailing his privileges, or providing additional supervision").

[103] *See Warren v. Reading Sch. Dist.*, 278 F.3d 163, 174 (3d Cir. 2002) (holding principal as appropriate person to report harassment to while declining to find the school guidance counselor as an appropriate person because he did not have authority over the accused harasser); *Ross v. Univ. of Tulsa*, No. 14-484, 2016 WL 1545138 (N.D. Okla. Apr. 15, 2016) (holding campus police were appropriate person because they had the authority to institute corrective measures aimed at ending harassment); *Burtner v. Hiram Coll.*, 9 F. Supp. 2d 852, 856 (N.D. Ohio 1998) (holding there was no actual notice to Hiram until student was leaving school, which was unrelated to the appropriate person standard).

[104] *Escue v. N. Okla.. Coll.*, 450 F.3d 1146, 1152 (10th Cir. 2006).

[105] Pl.'s Ex. 12.

[106] *Id.*

authority to issue corrective measures and thus was an "appropriate person" for purposes of reporting sexual harassment.

Endicott, the director of custodial services, oversaw all custodial and general services staff. Endicott had the power to hire, fire, and discipline employees, including Giles and Butler Brown. She also evaluated each custodial supervisor for PSU, and she signed off on supervisor evaluations of all employees. Malle testified that complaints were often referred to Endicott when they were beyond his control. Thus Endicott was an "appropriate person" for purposes of reporting sexual harassment.

Furthermore, the Court finds that Malle and Endicott were given "actual notice" of sexual harassment prior to March 2014. Actual notice "requires more than a simple report of inappropriate conduct . . . [however] the actual notice standard does not set the bar so high that a [school] is not put on notice until it receives a clearly credible report."[107] For example, the Tenth Circuit held in *Rost v. Steamboat Springs RE-2 School District* that the statement "that these boys were bothering me" was insufficient to put the school on actual notice of harassment.[108]

But here, without delving into any off-campus conduct to which Defendant argues Title IX does not cover,[109] there was more than sufficient evidence of actual notice of sexual harassment based solely on reports of the on-campus conduct. Plaintiff testified that in 2012 or 2013, she complained to Malle about Giles' conduct. Plaintiff further testified that she had complained to Malle sometime before the September 2013 incident in which Malle took she and

---

[107] *Escue*, 450 F.3d at 1154.

[108] 511 F.3d 1114, 1119 (10th Cir. 2008).

[109] The Tenth Circuit suggests that harassment off school grounds may create liability under Title IX where the school is in control over the harasser and the environment in which the harassment occurs, and there is a "nexus" between the out of school conduct and the harassment. *Rost v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1121 n.1 (10th Cir. 2008); *see also Weckhorst v. Kan. St. Univ.*, No. 16-2255, 2017 WL 980456(D. Kan. Mar. 14, 2017) (analyzing Tenth Circuit case law regarding off campus conduct and Title IX liability).

Giles to Endicott's office after their altercation. Plaintiff testified that although Malle assured her that he would tell Endicott, nothing improved, and in fact, the harassment worsened. In September 2013, Malle witnessed a confrontation between Giles and Plaintiff, and took them to Endicott's office. Plaintiff testified that during this meeting, she told Endicott about Giles rubbing against her in the bathroom stall while she cleaned, touching her hair, and making the sexual "hu-hu-hu" noise while saying she practiced all night for her. Plaintiff further testified that she told Endicott that Giles was lusting over her, and that Giles was undressing Plaintiff with her eyes.

Endicott testified that she first became aware of the conduct ongoing between Plaintiff and Giles in September 2013 when Malle brought Plaintiff and Giles to her office. Endicott further testified that Plaintiff never called the complained-of conduct "sexual harassment." Endicott testified that Plaintiff mentioned the "hu-hu-hu" sound Giles made that Plaintiff believed was sexual in nature. Endicott further testified that she then asked Plaintiff if she was alleging that Giles sexually harassed her, but Plaintiff did not answer. Endicott further testified that because of Plaintiff's nonresponse, Endicott did not perceive the conduct as sexual harassment. Giles's testimony contradicts Endicott's testimony about the meeting in Endicott's office. Giles testified that at the meeting Plaintiff told Endicott that Plaintiff was alleging sexual harassment, which prompted Giles to throw her glasses in frustration and suggest Plaintiff and her meet at the park to have a fist fight. [110]

Endicott further testified that Plaintiff did not make another complaint about harassment until February 2014 when Plaintiff showed Endicott the video of Butler Brown grabbing her crotch and saying "picture this." Endicott testified that this was the first time Plaintiff mentioned

---

[110] This was further corroborated in an email sent from Giles to Johnson stating that in the September 2013 meeting "M. Fox said I [Giles] sexually harassed her in McCray Hall." Pl's Ex. 20.

sexual harassment.  Endicott also testified that in the February 2014 meeting, Plaintiff advised her that Plaintiff had been telling Malle about this conduct for quite some time.

Sandra Brown testified that on another occasion, while she was in Endicott's office to make an unrelated complaint, Sandra Brown mentioned the relationship between Giles and Plaintiff to Endicott.  Sandra Brown told Endicott  "we all know something is going on" and "you can see her when she comes through the time clock, something has happened."[111]  Butler Brown suggested to Endicott that the two be split up.  Sandra Brown testified that Endicott stated it was none of Brown's business.  Sandra Brown further testified this while this was the only time she mentioned the conduct between Giles and Plaintiff to Endicott, she had brought it to Malle's attention "at least twice" before.  Sandra Brown had told Malle that there was something going on with Giles and Plaintiff, and it was getting out of hand, to which Malle responded that Endicott was taking care of it.

Rick Fox testified that after Plaintiff complained to Malle, on five or six occasions, Rick Fox  asked Malle whether he was going to do something to stop the conduct.  Rick Fox testified that he did not use the words "sexually hostile work environment" because he did not know what that was.  Later, Rick Fox complained to Endicott after Malle did nothing to stop the conduct. And, in February 2014, Rick Fox wrote a letter to Johnson that included many of the sexual harassment allegations his wife made.  Rick Fox's letter further stated that he was complaining to Johnson because "Wanda and Kevin [were not] doing anything about" the allegations.[112]

Viewing all of the testimony and evidence in the light most favorable to Plaintiff, the Court finds these facts sufficient to support a showing of actual notice to Malle and Endicott prior to March 2014.  There is no requirement that the words "sexual harassment" must be used

---

[111] Doc. 200 at 22:14–16.

[112] Pl's Ex. 10.

to put the university on notice.  Based on all of the testimony outlined above, there was sufficient evidence Malle had been told on multiple occasions about the ongoing conduct between Plaintiff and Giles as early as 2012, including comments about the "hu-hu-hu" noise, hair touching, questioning about Plaintiff's sex life, and Giles rubbing against Plaintiff.  During the September 2013 meeting in Endicott's office, Plaintiff put Endicott on actual notice of sexual harassment, describing conduct including Giles rubbing her body against Plaintiff in a bathroom stall and making sexual noises and gestures.  In fact, this prompted Endicott to question Plaintiff about whether she was alleging sexual harassment.  Testimony from Giles confirmed that at the September 2013 meeting, Plaintiff alleged and Giles understood Plaintiff to be alleging sexual harassment.  This was not merely an incident where Defendant "should have known" about the harassment, but rather, Defendant received actual notice of sexual harassment allegations. Viewing the evidence in the light most favorable to Plaintiff, there was evidence of actual notice to Malle and Endicott earlier than March 2014, and at the absolute latest in September 2013.

The Court further finds that there is sufficient evidence that having been given actual notice, Defendant acted with deliberate indifference.  A response is deemed to show deliberate indifference only where the federal funding recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.[113]  Thus, a response is deemed to amount to deliberate indifference where there is an official decision by the recipient not to remedy the violation.[114]

There was evidence that prior to September 2013, Plaintiff and Rick Fox had told Malle about sexually harassing conduct from Giles beginning in 2012.  Despite Malle's assurance that he was going to involve Endicott, he did not.  Nor did Defendant respond when Sandra Brown

---

[113] *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999).

[114] *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

put Malle and Endicott on actual notice of issues between Plaintiff and Giles.  Viewing the

evidence in the light most favorable to Plaintiff, this was unreasonable, in light of Malle's duty

per PSU training and policies to document everything, stop the harassment, and/or report it to

Johnson.[115]

Later, when Defendant was again given actual notice, this time during the September

2013 meeting, Defendant's only response was to direct Plaintiff to clock out after Giles in order

to avoid confrontation.  This was the only "remedial" measure taken.  Despite multiple

complaints of conduct constituting "sexual harassment,"[116] Defendant performed no

investigation, and Endicott did not report the complaints to Johnson so that Johnson could

investigate.  Based on PSU's policy and training, and information on its website,[117] sexual

harassment was to be reported to Johnson.  Nor did Defendant take disciplinary measures against

Giles.  Thus, as Plaintiff testified, after the September 2013 meeting, the harassing comments got

worse, including Giles calling her a bitch, telling her she smelled like a skunk, and flipping her

off.  Malle and Endicott's failure to report to Johnson, and the sole "remedial" measure of

separation at the time clock, could be viewed as unreasonable in light of the espoused allegations

of sexual harassment made at the meeting.

Defendant was again placed on actual notice in February 2014 when Plaintiff showed

Endicott the video recording of Butler Brown grabbing her crotch.  Malle responded by meeting

---

[115] Doc. 201 at 15:7–15.

[116] Defendant cites at length *Helm v. Kansas,* 656 F.3d 1277 (10th Cir. 2011), as analogous to the facts of this case.  In *Helm*, the allegations of sexual harassment were vague, including only allegations that the alleged harasser made the alleged victim uncomfortable and the relationship had become inappropriate. *Id.* at 1281.  There were no details involved. *Id.*  The alleged victim also said the matter was resolved, so no action was taken. *Id.* Once more specific allegations were made, there were corrective measures taken including an investigation, disciplinary proceeding, and a reassignment.  Here, there were sufficient details of the conduct between Giles and Plaintiff as well as evidence that the words sexual harassment were used.  Yet there was no investigation or discipline, and the only remedial measure was to have the women clock out separately.  Thus, the case is not analogous.

[117] Pl's Ex. 17.

with Butler Brown and taking notes on Butler Brown's side of the story.[118]  Malle testified he

told Butler Brown the conduct was inappropriate and that she should not do it again; and Malle

relayed this information to Endicott, who also talked to Butler Brown about the incident.  Notes

from their meeting suggested Butler Brown apologized to Endicott, and Endicott cautioned her

that the gesture was inappropriate and should not be repeated.  Neither Malle nor Endicott

referred this to Johnson as a complaint of sexual harassment.

Moreover, Johnson's response in March 2014 could be deemed unreasonable as a matter

of law.  As an appropriate person,[119] Johnson's investigation could reasonably be viewed as

deliberately indifferent.  Johnson received written complaints in March 2014 from Plaintiff and

Rick Fox that actually used the word "harassment," and outlined a number of incidents including

the incident in September 2013 meeting, the instance of Butler Brown rubbing her crotch, and

the instances of Giles asking about her sex life, and sitting in Plaintiff's custodial closet in the

dark.[120]  Plaintiff suggested Johnson talk to Butler Brown and other witnesses at the timeclock in

order to corroborate her allegations.  Yet Johnson did not interview those witnesses for fear it

would cause a "firestorm."[121]  Based solely on her communications with Giles, Rick Fox,

Endicott, Malle, and Plaintiff, Johnson decided that Giles committed no sexual harassment.  And,

---

[118] Pl's Ex. 37.

[119] Johnson admitted in her testimony that Plaintiff was subject to a sexually hostile work environment when she came forward to complain to Johnson.  This was further corroborated by an audio recording Fox made of a conversation between she and Johnson, where Johnson admitted as much.  Pl's Ex. 57bb.

[120] Pl's Ex. 4, 10.

[121] Defendant cites *Rost v. Steamboat Springs RE-2 School District,* 511 F.3d 1114, 1122 (10th Cir. 2008), for the proposition that the school is not charged with interviewing witnesses.  However, the Court finds this case distinguishable.  Whereas *Rost* involved school children, these were adults who were employees and undoubtedly should be held to a higher standard of conduct.  *Rost* also involved vague allegations that the victim was being "bothered."  The school did not conduct independent interviews in *Rost* because the police were called. Here, there was a handwritten statement outlining the allegations and even stating that harassment was being alleged.  Unlike in *Rost*, the police never conducted interviews in lieu of Defendant conducting an interview.  In light of the circumstances, refusal to interview any witnesses was a clearly unreasonable response given that Fox's written statement included the word "harassment."

Johnson also decided that Plaintiff had exhibited discriminatory conduct and contributed to a hostile work environment.[122]

Johnson issued a letter that stated that the complained of conduct was  inappropriate and in violation of PSU's Notice of Nondiscrimination and Sexual Harassment Policy.[123]  And as a "remedy," Johnson ordered Giles, Rick Fox, and Plaintiff to submit to sexual harassment training as discipline for mutually creating a hostile environment.  Yet during her meeting with Plaintiff to counsel on sexual harassment, Johnson acknowledged that the conduct Plaintiff experienced was so pervasive that it altered the condition of Plaintiff's work environment, and made Plaintiff uncomfortable and scared to come to work.  Unbeknownst to Johnson,  Plaintiff was audio recording their conversation; and the tape recording of Johnson's admissions was admitted into evidence.[124]  Viewing the evidence in the light most favorable to Plaintiff, there was sufficient evidence of a deliberately indifferent response to allegations of sexual harassment of which Defendant had actual notice.

### 2.     Title VII Claim

Defendant moves for judgment as a matter of law on the Title VII claim for five reasons—(1) Plaintiff failed to prove that the harassment occurred because of her gender; (2) Plaintiff bootstrapped non-sexual, non-gender based conduct into her sexual harassment claim; (3) Defendant is not liable for after hour, off campus conduct; (4) Plaintiff failed to prove the conduct was severe, physically threatening or humiliating, or that it interfered with her work; and (5) Plaintiff failed to show Defendant had actual or constructive notice of the harassment.

---

[122] Pl's Ex. 24.

[123] *Id.*

[124] Pl's Ex. 57bb.

a. **Harassment Because of Plaintiff's Gender**

Defendant contends it is entitled to judgment as a matter of law because Plaintiff provided insufficient evidence that the conduct was based on her gender. To bring a claim of gender discrimination based on a hostile work environment under Title VII, Plaintiff must establish (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment.[125] The Supreme Court has held that both opposite-sex and same-sex sexual harassment is actionable under Title VII, but that such harassment violates Title VII only when it is "because of sex."[126] Thus, the third element—harassment based on sex—requires that the animus be based on sex because Title VII does not establish "a general civility code."[127]

After recognizing a cause of action for same-sex sexual harassment, the Supreme Court laid out three evidentiary routes in which an inference of discrimination because of sex can be drawn in the hostile work environment context.[128] First, a factfinder could infer that the harassment was motivated by sex if the conduct consisted of proposals of sexual activity and "there [was] credible evidence that the harasser was homosexual."[129] Second, the plaintiff could show that she was "harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser [was] motivated by general hostility to the presence of women in

---

[125] *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007); *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1263 (10th Cir. 2005) (citing *Seymore v. Shawver & Sons, Inc.*, 111 F.3d 794, 798 (10th Cir. 1997)).

[126] *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79–80 (1998).

[127] *Id.* at 81.

[128] *Id.* at 80–81.

[129] *Id.* at 80.

the workplace."[130]  Third, the plaintiff could "offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace."[131]  Plaintiff takes the first evidentiary route.  Elaborating on the first evidentiary route, the Tenth Circuit holds whether same-sex harassment is because of the victim's sex hinges on whether the harasser's conduct is motivated by "sexual desire."[132]

Defendant argues that Giles's conduct was not based on Plaintiff's sex because many of the comments were non-sexual in nature, such as calling Plaintiff a skunk, telling her she stunk, and telling Plaintiff that she was going to beat her ass.  Although there was evidence of such non-sexual comments, there was sufficient evidence from which a reasonable jury could find that Giles's conduct was motivated by sexual desire, not by mere dislike.  Giles was openly homosexual, as she and her long-term partner Kristi McGowan testified. [133]  There was evidence that Giles rubbed against Plaintiff in the bathroom stall and touched her hair in a sexual manner. Giles made numerous statements that implicitly could be considered sexual proposals.  For example, Giles stated that she could make Plaintiff feel better than her husband, questioned Plaintiff's sexual performance with her husband, and questioned Plaintiff about whether she had ever been with a woman.

Further, Giles made sexual gestures to Plaintiff.  For example, Giles rubbed her crotch at the timeclock and made  a "hu-hu-hu" noise while stating she had been practicing all night for Plaintiff.  Plaintiff testified Giles waited in Plaintiff's custodial closet with the lights off and stated she was glad Plaintiff made it and it was about time she got there.  Giles did not need to

---

[130] *Id.* at 80–81.

[131] *Id.*

[132] *See Dick*, 397 F.3d at 1265.

[133] *Id.* ("[T]he fact that the harasser is homosexual may support a finding that her conduct was motivated by sexual desire.").

35

explicitly ask Plaintiff to engage in sexual acts or to go on a date, as Defendant suggests. Viewing the evidence in the light most favorable to Plaintiff, there was sufficient evidence for a reasonable jury to conclude that Giles's conduct was based on sexual desire, and that Giles's conduct was based on Plaintiff's sex.

Defendant further argues that because Butler Brown was not proven to be homosexual, her conduct could not be considered to be based on Plaintiff's sex. However, the Tenth Circuit has explicitly stated that the alleged harasser need not be openly homosexual as long as the conduct was motivated by sexual desire.[134] While there was no evidence submitted about Butler Brown's sexual orientation, there was sufficient evidence that the February 2014 incident was motivated by sexual desire. Butler Brown was caught on camera looking at Plaintiff. She grabbed her crotch and told Plaintiff to "picture this." Viewing the evidence in the light most favorable to Plaintiff, this is suggestive of an implicit invitation to engage in sexual conduct rather than "non-sexual horseplay" as Defendant suggests.

Defendant also argues that the alleged harassment was not based on sex because it was merely "non-sexual conduct, innocuous events, and/or bullying."[135] The Court rejects Defendant's argument that in admitting evidence of non-sexual conduct that underlay Plaintiff's retaliation claim, the Court improperly subjected Defendant to liability on the retaliation claim on which the Court had previously granted summary judgment to Defendant. This argument lacks merit for several reasons. First, as the Court will explain in more depth below, the Tenth Circuit allows for consideration of facially gender-neutral abusive conduct.[136] Second, the Court previously explained in its *limine* order that many of these facially gender-neutral events

---

[134] *Id.* ("But a plaintiff need not, in every first-evidentiary-route case, establish that her harasser is homosexual in order to demonstrate that the harassing conduct was motivated by sexual desire.").

[135] Doc. 210 at 5.

[136] *See O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999).

properly relate to both the retaliation claim and the hostile environment sexual harassment claim. For example, evidence of Giles challenging Plaintiff to a fistfight is relevant to both to the retaliation claim and the severity or pervasiveness of the harassment. Third, the jury was not instructed on retaliation, so Defendant is not being held liable on such a theory.

### b. "Bootstrapping" Non-Sexual, Non-Gender Conduct

Defendant next contends it is entitled to judgment because Plaintiff is improperly "bootstrapping" non-sexual, non-gender based conduct as evidence. Although inartfully drafted, Defendant's brief seems to suggest that Plaintiff must meet a threshold for gender-related comments and conduct before non-gender-related comments and conduct may be considered, and that the evidence of gender-related conduct was insufficient in detail and frequency to allow admission of the non-gender-related conduct. Defendant cites no case law supporting its "threshold" theory, and the Court declines to impose such a requirement absent direction from the Tenth Circuit.

In fact, facially gender-neutral abusive conduct can support a gender-based hostile work environment claim when "viewed in the context of other, overtly gender-discriminatory conduct." [137] Thus, when a plaintiff introduces evidence of both gender-based and gender-neutral harassment, and when a jury, viewing the evidence in context, "reasonably could view all of the allegedly harassing conduct . . . as the product of sex and general hostility," then "it is for the fact finder to decide whether such an inference could be drawn."[138] The Tenth Circuit has also cautioned that there cannot be a "mathematically precise test" for a hostile work

---

[137] *Id.* at 1097; s*ee also Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005) ("The question then becomes whether Plaintiffs can use a substantial amount of arguably gender-neutral harassment to bolster a smaller amount of gender-based conduct on summary judgment. Our precedents say that they can.").

[138] *Chavez*, 397 F.3d at 833 (citing *O'Shea*, 185 F.3d at 1102).

environment claim.[139]  Here it was proper to admit evidence of the gender-neutral abusive

conduct, including: (1) Giles challenged Plaintiff to a physical altercation; (2)  Giles threw her

eyeglasses across Endicott's office during the September 2013 meeting; and (3) Giles called

Plaintiff a "bitch," told Plaintiff she was going to wipe her ass with Plaintiff, and told Plaintiff

she smelled like a skunk.

Moreover, Defendant ignores or downplays nearly all of the gender-related harassment

alleged at trial.  As the Court has outlined in detail above, there is more than sufficient evidence

of sexually charged conduct and comments.[140]  A reasonable jury could credit this evidence

despite the fact that the testimony did not specify the dates or precise frequency of this conduct.

Plaintiff testified that the sexually harassing conduct between her and Giles began in

2012 and continued for approximately two years, until she filed her charge of discrimination

with the EEOC in March 2014.  Plaintiff testified incidents would happen two to three times per

week.  Plaintiff testified that the harassing conduct worsened in March or April 2013.  Sandra

Brown corroborated this testimony when she testified that Giles would harass Plaintiff two to

three nights a week.  Sandra Brown testified this happened in 2013 and 2014, and she estimated

this went on for a year and a half.  Taken together, in the light most favorable to Plaintiff, there

was sufficient evidence of overtly gender-related sexual comments and conduct. Plaintiff

presented specific examples of sexually charged conduct and comments, identified general time

frames of the conduct, and provided relevant content and context of these comments.[141]

---

[139] *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir. 2012) (citing *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 22 (1993)).

[140] *See supra* Part II. B.1.c.ii; II.B.2.a (outlining testimony relating to sexually charged conduct and comments, including non-consensual hair touching, rubbing against Plaintiff in the bathroom, sexually charged comments, and Giles wiping her crotch in front of Plaintiff).

[141] *Compare Hernandez*, 684 F.3d at 959 (finding sufficient evidence of hostile work environment where plaintiff was giving specific examples of her supervisors' racial jokes, identifying general time frames, and providing the relevant content and context of these comments) *with Ford v. West*, 222 F.3d 767, 777 (10th Cir.

### c.    Off-Campus, After-Hour Conduct For Title VII Liability

Defendant also contends it is entitled to judgment as a matter of law as to all off-campus, after-hours conduct.  Defendant refers to: (1) evidence regarding the conduct of Kristi McGowan, Giles's long-time partner, because McGowan was a non-employee, and her conduct was off-campus; and (2) evidence regarding the February 21, 2014 incident where Giles and McGowan were at and/or near the Fox home.

Defendant does not cite case law supporting its argument that conduct occurring outside of the office cannot be considered for purposes of Title VII.  Rather, Defendant seeks to distinguish *Meritor Savings Bank FSB v. Vinson*,[142] a Title VII sexual harassment hostile work environment case.  In *Meritor*, the Supreme Court found proper the consideration of a number of the allegations related to the supervisor-harasser's conduct after business hours and outside of the workplace.[143]  Defendant argues *Meritor* is distinguishable because the victim and harasser in *Meritor* were in a supervisor-supervisee relationship and the harassment had a nexus to work. But, while *Meritor* is factually distinguishable, the general proposition that after-work and out-of-office conduct may be considered applies in this case.

Although Giles and Plaintiff did not have a supervisor-supervisee relationship like in *Meritor*, the February 21 off-campus and after-hours incident certainly had a work nexus.  Giles and McGowan were *on campus* when Rick Fox and Plaintiff got off work.  McGowan flashed her lights at the Foxes *on campus*, and Giles pulled up alongside their car.  Plaintiff and Rick Fox left the campus, stopped at a gas station, and continued home.  When they arrived home, McGowan was waiting in her vehicle, in front of the Foxes's home, while Giles was in her own

---

2000) (finding insufficient allegations of harassment where the plaintiff "baldly assert[ed] he was continuously subjected to racial slurs," and provided no record citations to any "content, context or date of such slurs.").

[142] 477 U.S. 57 (1986).

[143] *Id.* at 59–60.

vehicle, sitting at the end of the Foxes' street.[144]  McGowan and Rick Fox got into an altercation in the Foxes' driveway, and Plaintiff called the police.  The altercation stemmed from events in the workplace earlier that day; Endicott had told Giles that Plaintiff was accusing her of sexual harassment.  Furthermore, Rick Fox testified that during his altercation with her, McGowan was on the phone with Giles and he could hear them talking to each other.   Further, Plaintiff testified that she reported this incident to Endicott *at work*, but Endicott stated nothing could be done as this was off campus, outside of work hours, and involved a non-employee.  Viewing the evidence in the light most favorable to Plaintiff, the Court finds there was a nexus between this conduct and the workplace as the harassing conduct began on campus and Giles, an employee, was nearby and talking with her partner McGowan throughout McGowan's encounter with Plaintiff and Rick Fox.

Further, Defendant's argument that employees could not be disciplined for off-campus conduct is without merit.  Endicott testified an employee could lose his or her job for off-campus conduct.  For example, in the September 2013 meeting in Endicott's office, Giles told Plaintiff that they should go to a park and have a fist fight.  Endicott warned Giles that she could lose her job for such conduct.

Finally, Defendant points to this Court's ruling granting Defendant summary judgment on the retaliation claim, as supporting Defendant's argument that Endicott and Malle had no control over McGowan' conduct during the February 21, 2014 altercation.  In the context of the previously dismissed retaliation claim, this Court stated:

> Similarly, no reasonable jury could find that Malle and Endicott's response when the Foxes told them that McGowan came to their house amounted to encouragement of McGowan's behavior or disregard for Plaintiff's complaint.  Rather, they expressed their belief that they could not discipline Giles for behavior by her girlfriend that occurred

---

[144] Rick Fox and Martha Fox both testified that Giles was at the end of the street.  Doc. 200 at 86:12–14; Doc. 201 at 115:22–23.

> outside of the workplace. Furthermore, although Giles was in her car down the street during the interaction between Rick Fox and McGowan, any retaliatory behavior during this interaction was by McGowan, who was not a PSU employee and over whom Malle and Endicott had no authority.[145]

But this reasoning was in the context of consideration of the retaliation claim. This incident may still properly be considered for the hostile work environment sexual harassment claim because it goes to the severity and physically threatening nature of the environment. Given that Giles was a part of the incident and it was immediately following work, this incident should not be disregarded as a matter of law as it was undoubtedly relevant to the environment.

### d. Severe, Physically Threatening or Humiliating Conduct

Plaintiff must show that the harassment was objectively and subjectively so severe or pervasive that it altered a term, condition, or privilege of her employment.[146] Whether the harassment is objectively "severe or pervasive" is determined from the totality of the circumstances after "considering such factors as 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"[147] This objective inquiry focuses on the perspective of a "reasonable person in the plaintiff's position, *considering all the circumstances*,"[148] and requires "careful consideration of the social context in which particular behavior occurs and is experienced by its target."[149]

By requiring a showing of a workplace permeated by severe or pervasive discriminatory conduct, the Supreme Court struck a balance between two extremes, creating "a middle path

---

[145] Doc. 127 at 25.

[146]*Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012).

[147]*Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005) (quoting *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir.1999)).

[148]*Morris*, 666 F.3d at 664 (quoting *Harsco Corp. v. Renner*, 475 F.3d 1179, 1187 (10th Cir. 2007)).

[149]*Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).

between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury."[150]  In so doing, the Supreme Court excluded from actionable conduct that which is "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing," because Title VII was not meant to be a "general civility code."[151]  "'[S]imple teasing,' . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"[152]  On the other hand, conduct need not be so severe or pervasive that it seriously affects a plaintiff's psychological well-being.[153]  While the Court has already found there was sufficient evidence of the severity or pervasiveness of the harassment in the Title IX context, the Court will expand on some of these findings and address a number of Defendant's arguments in the briefing.

Defendant argues that there is evidence of only one incident of physical contact between Giles and Plaintiff, the hair touching incident.  Defendant argues the lack of physical contact alone makes the conduct not severe enough to be actionable.  But the Tenth Circuit has held the opposite.[154]  Defendant further argues that an objective, reasonable person would not consider the incidents of hair touching offensive, because it was done in a non-sexual manner.  But the context of the incident must be considered.[155]  While hair touching may be done in a non-sexual manner, here Plaintiff testified that Giles had previously made sexual comments to her.  In light of these circumstances, what otherwise might be a non-sexual gesture, like hair touching, may

---

[150] *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

[151] *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998).

[152] *Id.* (citation omitted).

[153] *Nieto v. Kapoor*, 268 F.3d 1208, 1219 (10th Cir. 2001) (citation omitted).

[154] *Smith v. Nw. Fin. Acceptance, Inc.*, 129 F.3d 1408, 1416–17 (10th Cir. 1997) (stating that the plaintiff was "not required to produce evidence of physical abuse or contact to establish a hostile work environment").

[155] *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998).

become sexualized. Although there was contrary evidence that the hair touching incident was consensual, the credibility of the witnesses was within the province of the jury, not the Court. Thus, in viewing the hair touching incident in the light most favorable to Plaintiff, there was credible evidence that the hair touching was non-consensual and sexual in nature in light of the context. Moreover, there was other evidence of physical contact.[156] Plaintiff testified that Giles rubbed against her in the bathroom stall.

Even if there was no evidence of physical contact, there is ample evidence of comments and other conduct of an overtly sexual nature.[157] To the extent that Defendant asks this Court to disregard these statements as fabricated, untrue, or contradicted by other evidence, that is improper, as credibility determinations are the province of the jury. Moreover, beyond the overtly sexualized conduct and comments, there was also evidence of gender-neutral harassment.[158] Contrary to Defendant's baseless characterizations, there were a number of incidents that could reasonably be viewed as threatening, including: Giles sitting in her car at the top of the Foxes' street after Giles followed them home from work, Giles threatening to wipe her ass with Plaintiff during an incident that almost turned into a physical altercation, Giles telling Plaintiff she smelled like a skunk, and Giles calling Plaintiff a bitch. These are all events that show both the hostility and threatening nature of the environment which a reasonable person could view as humiliating and threatening. Collectively, the evidence of the sexual physical

[156] Further, to the extent that physical contact strengthens Plaintiff's case, there was evidence of other physical contact between Giles and Plaintiff. Giles rubbed against Plaintiff in a bathroom stall in McCray Hall. Defendant invites the Court to find this as "manufactured" testimony, but it was for the jury to decide the credibility of Plaintiff's testimony. Viewing this evidence in the light most favorable to Plaintiff, this was non-consensual, intentional, physical contact of a sexual nature.

[157] *See supra* Part II. B.1.c.ii; II.B.2.a (outlining Plaintiff's testimony that Giles would wipe her crotch at the timeclock, Giles asked Plaintiff about her sexual performance with her husband, Giles asked Plaintiff whether she had been with a woman, Giles stated she wanted to taste Plaintiff, Giles made a "hu-hu-hu" noise while stating she had practiced it all night for her, Giles stated she could make Plaintiff feel better than her husband, and Butler Brown wiped her crotch and told Plaintiff to "picture this").

[158] *See supra* Part II.B.2.b.

touching, the sexually overt conduct and comments, and the gender-neutral conduct and comments shows an objectively severe or pervasive hostile environment.

Defendant further contends Plaintiff did not subjectively experience a severe or pervasive environment because it was stipulated that Plaintiff continued receiving "satisfactory" work performance evaluations. While this is a factor to consider in the objective inquiry into the severity of the environment, this does not mean Plaintiff did not subjectively experience a severe or pervasive environment. It is undoubtedly possible for a person to be depressed and scared at work while still working to maintain employment. As explained in the Title IX discussion above, there was evidence that Plaintiff had heightened anxiety, depression, sleeplessness, and weight loss during the harassment. Sandra Brown and Rick Fox corroborated the difference in Plaintiff's personality pre-harassment and post-harassment. Plaintiff testified that she often had to take breaks during work and sit in her custodial closet to escape. Even that coping mechanism was impaired when Giles waited uninvited for Plaintiff in Plaintiff's darkened custodial closet. There is no requirement that Plaintiff seek treatment in order to show she subjectively experienced the hostile environment. Her testimony along with the corroborating witnesses is more than sufficient evidence of Plaintiff's subjective experience of a hostile environment.

Defendant, without citation, argues that Plaintiff has not met the frequency or specificity requirements for Title VII as to the allegations of harassment between the September 2013 meeting with Endicott and February 21, 2014 when Endicott told Giles that Plaintiff was accusing her of sexual harassment. Once again, this argument is contradicted by the record. Plaintiff testified the conduct got worse during this period.[159] Giles would "flip-off" Plaintiff and say curse words. She would wipe her crotch, and she would make the "hu-hu-hu" noise.

---

[159] Doc. 200 at 77:14.

Plaintiff testified Giles called her a bitch and said she smelled like a skunk. Butler Brown also harassed Plaintiff. Plaintiff testified this occurred two to three times a week, which Sandra Brown corroborated. There was sufficient evidence that the harassment was steady throughout the period between September 2013 and May 2014.

Moreover, a reasonable jury could also find that Plaintiff experienced both a subjectively and objectively severe or pervasive hostile environment that altered the terms and conditions of her employment because Johnson, Defendant's Title IX coordinator, agreed as much. In an audio recording Plaintiff surreptitiously made during their meeting, Johnson acknowledged that Plaintiff was being sexually harassed and that there was a sexually hostile work environment.[160] Although Defendant argues this tape was improperly admitted and taken out of context, Johnson's deposition testimony and in-court testimony was consistent with Johnson's tape-recorded statements.[161] Thus, viewing the evidence in the light most favorable to Plaintiff, there was sufficient evidence of an objectively and subjectively hostile environment that altered the terms and conditions of Plaintiff's employment.

e.      **Actual or Constructive Notice and Inadequate Response**

Finally, to succeed on her Title VII claim, Plaintiff must also show that PSU "had actual or constructive knowledge of the hostile work environment but did not adequately respond to notice of the harassment."[162] Actual knowledge will be demonstrable in most cases where the plaintiff has reported harassment to management-level employees.[163] Constructive knowledge will be demonstrable where the pervasiveness of sexual harassment can properly lead to an

---

[160] Pl's Ex. 57.

[161] *See, e.g.*, Doc. 201 at 48: 17 ("I agree that it was a hostile environment."); Doc. 201 at 48:4–13 (stating in deposition that Fox was subjected to a sexually hostile work environment that was pervasive enough to change the nature of her work environment).

[162] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 673 (10th Cir. 1998).

[163] *Id.*

inference of knowledge.[164]  To determine whether a response is adequate, an employer is not strictly liable for all harassment of which it had actual or constructive knowledge.[165]  Rather, it may discharge its obligation by taking appropriate remedial or preventative action "reasonably calculated to end the harassment."[166]  If the harassment does not stop, the court may "consider the timeliness of the plaintiff's complaint, whether the employer unduly delayed, and whether the response was proportional to the seriousness and frequency of the harassment."[167]  The Court has found sufficient evidence to meet the higher standard of actual notice and deliberate indifference for purpose of Title IX.[168]  Because this is a higher standard, the Court incorporates that discussion by reference and finds there is sufficient evidence of actual notice and an inadequate response for purposes of Title VII.[169]

## III.    Motion for New Trial or in the Alternative Remittur

### A.    Standard for Motion for New Trial

Under Federal Rule of Civil Procedure 59(a), a court may grant a new trial on all or some of the issues on motion of a party "after a jury trial, for any reason for which a new trial has

---

[164] *Id.*

[165] *Id.* at 676.

[166] *Id.* at 675–76.

[167] *Id.* at 676.

[168] *See supra* Part II.B.1.d.

[169] Defendant suggests that this Court has already found Defendant's response was reasonable because at summary judgment, this Court ruled Defendant did not condone or encourage Gile's behavior.  This finding was made in relation to the retaliation claim, which has different standards.  This Court has not ruled upon the sufficiency of Defendant's response for purposes of actual or constructive notice and whether its response was reasonable.  In fact, this was a genuine issue of material fact at summary judgment.  Doc. 127 at 22–23 ("Whether PSU's response to Plaintiff's report was adequate depends on when PSU had notice of her complaint.  If Plaintiff complained to Malle repeatedly and reported sexual harassment in September 2013, it would appear that PSU did not adequately investigate her complaint since it did not begin an investigation until her February 2014 report.  If, on the other hand, her first report of sexual harassment was on February 19, 2014, it will be a question for a jury to determine whether the investigation conducted by Johnson was adequate.").  Defendant's attempt to twist this Court's wording and findings is not well received.  Thus, although Malle and Endicott may not have condoned Giles's behavior, this does not mean the response was reasonable in light of the allegations of sexual harassment.

heretofore been granted in an action at law in federal court."[170]  Motions for new trial are committed to the sound discretion of the district court.[171]  Courts do not regard motions for new trial with favor and only grant them with great caution.[172]

"If 'a new trial motion asserts that the jury verdict is not supported by evidence, the verdict must stand unless it clearly, decidedly, or overwhelmingly against the weight of the evidence.'"[173]  In reviewing a motion for new trial, the Court views the evidence in the light most favorable to the prevailing party.[174]  If a new trial motion is based on an error at trial, the court cannot grant the motion unless the error prejudiced the party's substantial rights.[175]

### B.    Standard for Motion for Remittitur

The use of remitter is committed to the discretion of the trial court.[176]  Remittitur is warranted when an award of damages shocks the judicial conscience and raises an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial.[177]  Defendant bears the heavy burden of demonstrating that the verdict was "clearly, decidedly, or overwhelmingly against the weight of the evidence."[178]

---

[170] Fed. R. Civ. P. 59(a)(1)(A).

[171] *See Unit Drilling Co. v. Enron Oil & Gas Co.*, 108 F.3d 1186, 1193 (10th Cir. 1997).

[172] *Franklin v. Thompson*, 981 F.2d 1168, 1171 (10th Cir.1992).

[173] *M.D. Mark, Inc. v. Kerr–McGee Corp.*, 565 F.3d 753, 762–63 (10th Cir. 2009) (quoting *Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1284 (10th Cir. 1999)).

[174] *Griffin v. Strong*, 983 F.2d 1540, 1543 (10th Cir. 1993).

[175] *See Henning v. Union Pac. R.R.*, 530 F.3d 1206, 1216–17 (10th Cir. 2008) (citing Fed. R. Civ. P. 61).

[176] *Blanke v. Alexander*, 152 F.3d 1224, 1236 (10th Cir. 1998).

[177] *See Prager v. Campbell Cty. Mem'l Hosp.*, 731 F.3d 1046, 1062 (10th Cir. 2013); *Capstick v. Allstate Ins. Co.*, 998F.2d 810, 820 (10th Cir. 1993).

[178] *Blanke*, 152 F.3d at 1236 (citations and quotations omitted).

## C. Discussion

Defendant's motion for new trial identifies a laundry list of alleged trial errors, as well as alleged errors in various pretrial rulings. These errors fall into five categories: (1) double recovery, (2) excessive verdict/ remittitur, (3) improperly admitted evidence leading to prejudice, (4) admission of an audio recording, and (5) jury instructions. Each category of alleged error will be addressed in turn.

### 1. Double Recovery

The jury awarded Plaintiff $100,000 on the Title IX claim and $130,000 on the Title VII claim. Defendant contends that Plaintiff impermissibly double recovered for her Title IX and Title VII claim because both claims are based on the same operative facts. Defendant alleges that Plaintiff is seeking redress for emotional distress from sexual harassment under Title VII and Title IX, so she may be remedied under only one statute.

The issue of whether an award is duplicative is a question of fact, which is reviewed for clear error.[179] An error is clear only if the court's finding is without factual support in the record or if, after reviewing all the evidence, there is a firm and definite conviction that a mistake has been made.[180] Double recovery "dictates that 'in the absence of punitive damages a plaintiff can recover no more than the loss actually suffered,'" and thus, when a plaintiff seeks compensation for wrongs committed, the plaintiff should be made whole for the injuries, not enriched.[181] If two claims "arise from the same operative facts, and seek identical relief, an award of damages

---

[179] *J.M. v. Hilldale Indep. Sch. Dist. No. 1-29*, 397 F. App'x 445, 460 (10th Cir. 2010) (citing *N. Am. Speciality Ins. Co. v. Britt Paulk Ins. Agency, Inc.*, 579 F.3d 1106, 1113 (10th Cir. 2009)).

[180] *N. Am. Specialty Ins. Co.*, 579 F.3d at 1113.

[181] *Medina v. District of Columbia*, 643 F.3d 323, 326 (D.C. Cir. 2011) (quoting *Kassman v. Am. Univ.*, 546 F.2d 1029, 1033 (D.C. Cir. 1976) (per curiam)).

under both theories will constitute double recovery."[182]  A jury, however, is not prohibited from

allocating a single damages award between two distinct theories of liability.[183]  Because a

reviewing court's role under the Seventh Amendment is "to reconcile and preserve whenever

possible" a jury verdict, the court must start with a presumption that the damages awards were

not duplicative.[184]  Thus, the question here is whether Plaintiff was unjustly enriched by being

granted damages for sexual harassment under both Title IX and Title VII.

Title IX and Title VII are two distinct theories of liability.  Title VII and Title IX protect

two different rights.  As the Supreme Court explained in *Gebser*,

> Title VII applies to all employers without regard to federal funding and aims broadly to
> "eradicat[e] discrimination throughout the economy."  Title VII, moreover, seeks to
> "make persons whole for injuries suffered through past discrimination."  Thus, whereas
> Title VII aims centrally to compensate victims of discrimination, Title IX focuses more
> on "protecting" individuals from discriminatory practices carried out by recipients of
> federal funds.[185]

While many elements of Title VII and Title IX claims overlap,[186] there are some distinctions

even in the elements of the claim.  For instance, Title IX applies an actual notice and deliberate

indifference standard where Title VII has an actual or constructive notice and adequate remedial

response.

The jury's award of a net total of $230,000 is consistent with the low end of the total

request for recovery made by Plaintiff's counsel during closing.  He stated in his closing

arguments, "I'm going to suggest a number to you that—I base it on cases we've had, similar

---

[182] *J.M.*, 397 F. App'x at 460 (citation omitted).

[183] *Ridgell-Boltz v. Colvin*, 565 F. App'x 680, 684 (10th Cir. 2014); *see also Teutscher v. Woodson*, 835 F.3d 936, 954 (9th Cir. 2016) (citing *Medina*, 643 F.3d at 326; *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 497 (2d Cir. 1995)).

[184] *Matrix Grp. Ltd. v. Rawlings Sporting Goods Co.*, 477 F.3d 583, 592 (8th Cir. 2007) (citing *Indu Craft, Inc.*, 47 F.3d at 497).

[185] *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998).

[186] *See Mabry v. St. Bd. of Comm.Colls. & Occupational Educ.*, 813 F.2d 311, 316 (10th Cir. 1987).

ones, just a range and—of cases in this area of, you know, about $230,000 to $350,000."[187]

While it is possible that the jury impermissibly compensated Plaintiff twice for her emotional

distress resulting from sexual harassment, it is equally rational to believe that the jury found that

Plaintiff suffered $230,000 worth of injuries and allocated the amount between the two distinct

theories of liability, one for Title IX and one for Title VII.[188] Defendant has not shown the Court

that the evidence of double recovery is so in its favor that it was clear error.

### 2. Excessive Verdict/ Remittitur

Defendant requests remittitur or a new trial because the damage award was excessive in

light of the evidence of emotional distress damages. Defendant first argues that the evidence of

emotional or mental distress Plaintiff presented is insufficient to justify the jury's damage award.

Defendant next argues that the verdict is excessive because the alleged harassment, which

included "almost no" allegations of physical harassment, was not severe. The Court has already

twice addressed and found that there was evidence of physical harassment, and even if there

were no physical harassment, the overtly sexual and non-sexual harassment was severe and

pervasive.[189] However, the Court will address whether emotional distress evidence warrants the

$230,000 damage award.

---

[187] Doc. 202 at 17:4–7

[188] *See Indu Craft, Inc.*, 47 F.3d at 497 (allowing award of $2 million on breach of contract claim and $1.25 million on tort claim redressing the same wrongdoing because expert testified that net total of $3.25 million worth of damage).

[189] *See supra* Part II.B.1.c. (discussing severity or pervasiveness of hostile environment in Title IX context), II.B.2.d. (discussing severe, physically threatening, humiliating nature of conduct in Title VII context); *see also Smith v. Nw. Fin. Acceptance, Inc.*, 129 F.3d 1408, 1416–17 (10th Cir. 1997) (stating that the plaintiff was "not required to produce evidence of physical abuse or contact to establish a hostile work environment"). The Court declines to reconsider its severity or pervasiveness analysis by applying the factors enumerated in *Blangsted v. Snowmass-Wildcat Fire Protection District,* 642 F. Supp. 2d 1250, 1257 (D. Colo. 2009), as Defendant requests. This does not comport with Tenth Circuit precedent.

Defendant argues this case is comparable to *Hughes v. Regents of University of Colorado*[190] and *Wulf v. City of Wichita*.[191]   In *Hughes*, the plaintiff received a $125,000 award in a Title VII sexual discrimination case where the plaintiff was "bumped" to a different position with less responsibility yet equal pay, hours and benefits based on her gender.[192]   The verdict reflected damages for emotional distress, pain, suffering, and mental anguish.[193]   There was no evidence concerning economic loss.[194]   The emotional distress evidence was based solely on plaintiff's own testimony.[195]   The plaintiff testified that she never sought treatment for emotional or physical problems.[196]   The judge found that this verdict was excessive and remitted the verdict to $50,000 because her "bumped" position was nearly equivalent to the old position and she suffered distress equivalent to that of losing any job.[197]

In *Wulf*, the Tenth Circuit held that an award of $250,000 in damages for emotional distress was excessive and remanded the case for reconsideration and an award of damages not to exceed $50,000.[198]   In that case, a former police officer brought a civil rights action against the city and its administrators following his termination.[199]   The plaintiff in that case testified that, as a result of defendant's behavior, his job was "very stressful," and he was angry, depressed, scared, and frustrated. [200]   Wulf's wife testified that he was under "tremendous emotional strain"

---

[190] 967 F. Supp. 431 (D. Colo. 1996).

[191] 883 F.2d 842 (10th Cir. 1989).

[192] 967 F. Supp. at 433, 438.

[193] *Id.* at 437.

[194] *Id.*

[195] *Id.*

[196] *Id.*

[197] *Id.*

[198] 883 F.2d 842, 875 (10th Cir. 1989).

[199] *Id.*

[200] *Id.*

and that they experienced significant financial difficulties.[201]  Recognizing the lack of descriptive

evidence of emotional distress, the Tenth Circuit held that, although some award was warranted

for emotional damages, $250,000 was clearly excessive.[202]  The *Wulf* court looked to other

awards given in connection with alleged emotional damages and held that $50,000 was the

maximum reasonable award in that case.[203]

      The Court finds this case distinguishable from *Hughes* and *Wulf*, which are both more

than twenty-year-old cases.[204]  Both parties seem to agree that Plaintiff's $230,000 award

necessarily reflects damages for emotional distress, pain, suffering, and mental anguish.  There

was no evidence concerning diminution in salary, decreased benefits, or other similar economic

loss.  Plaintiff testified in detail to increased use of anxiety medication and severe physical

manifestations of her emotional distress, including weight loss, sleeplessness, and depression.

Although Plaintiff's work performance did not suffer, Plaintiff testified she was scared to go to

work, and she often took breaks to be alone in her custodial closet.  Giles was apparently aware

of this, for when Plaintiff unwittingly entered her darkened custodial closet, Giles was waiting

---

[201] *Id.*

[202] *Id.*

[203] *See id.*

[204] Defendant also cited a number of "more recent" cases for the proposition that remittitur is warranted. However, the Court finds these cases distinguishable.  *Cline v. Walmart Stores, Inc.*, 144 F.3d 294 (4th Cir. 1998) (remitting a jury award in a *demotion* case to $10,000 from $117,500 where there was no evidence of physical symptoms, no evidence of medication, no evidence of an inability to cope at work, and only suggestions of emotional trauma); *MacMillan v. Millenium Broadway Hotel*, 873 F. Supp. 2d 546, 563 (S.D.N.Y. 2012) (remitting a jury award in a racial hostile work environment case from $125,000 in emotional distress damages to $30,000 where no evidence of medical treatment, physical manifestations, or impact on his work ability, and the only emotional distress testimony was that the plaintiff felt "horrible"); *Dotson v. City of Syracuse*, No. 04-CV-1388, 2011 WL 817499, at *22 (N.D.N.Y. Mar. 2, 2011) (remitting a jury award in a *retaliation* case from $450,000 to $50,000 where there was not substantial corroborating testimony and the plaintiff suffered a *one-time* occurrence that was not ongoing or continuous); *Vera v. Alston Power, Inc.*, No 12-CV-00382, 2016 WL 3014614, at *11 (D. Conn. May 24, 2016) (remitting a jury award in *retaliation* case from $500,000 to $125,000 where the plaintiff was the only witness to testify about emotional distress, general and conclusory terms described the distress, and she offered no proof physical manifestations); *McInnis v. Town of Weston*, 458 F. Supp. 2d 7, 19 (D. Conn. 2006) (remitting a jury award in *retaliation* case of $860,000 to $150,000 where the plaintiffs never testified to any physical manifestations and there was no corroborating testimony).

there, to sexually harass her.  Plaintiff was not the only person testifying to her emotional

distress.  Rick Fox, who both worked at PSU and lived with her, corroborated her testimony.[205]

Rick Fox testified Plaintiff's children and grandchildren noticed her behavior change, and that

his and Plaintiff's children refused to bring their grandchildren over for fear of Giles's threats to

Plaintiff.  Her emotional distress was further corroborated by Brown, who testified that she went

from happy to unhappy during the period of harassment.  Plaintiff admitted she did not seek

counseling or medical treatment, but she did increase her dosage of Xanax.[206]

Plaintiff also faced a different form of discrimination than the plaintiff in *Hughes*, who

was "bumped" to a different job, and in *Wulf*, who was fired in retaliation for writing a letter to

have the police department investigated.  While the plaintiffs in *Wulf* and *Hughes* faced one-time

events, Plaintiff faced intentional hostile work environment sexual harassment for nearly two

years.  Her job prior to the sexual harassment was nothing like the job during the sexual

harassment.  She faced physical sexual harassment, overt sexual comments and conduct, and

threats sometimes multiple times a week, changing the terms and conditions of her employment

over the course of two years.  Plaintiff attempted to address this with her managers who either

did nothing, asked her to clock in at a different time than her harasser, or in the case of Johnson,

punished her as well as her harasser.  This is an entirely different set of circumstances than

*Hughes* and *Wulf*, which warrants a much larger award.

---

[205] Defendant extensively argues Rick Fox was not credible because he stood to gain financially from the trial.  The Court does not consider such an argument as it is an improper credibility determination at the post-trial stage.  *Griffin v. Strong*, 983 F.2d 1540, 1543 (10th Cir. 1993).

[206] Defendant argues that Plaintiff did not have corroborating medical testimony.  However, this is not required, and the jury instruction says as much.  Jury Instruction No. 13 ("Evidence of mental anguish need not be corroborated by doctors, psychologists . . . .").

The Court finds the more recent case of *McInerney v. United Airlines*[207] instructive. In *McInerney*, the jury awarded in a Title VII retaliation case compensatory damages in the amount of $3 million, which were remitted by the Tenth Circuit to the statutory cap of $300,000.[208] The Tenth Circuit moved away from its approach in *Wulf* of comparing awards in other cases, and rather, it cautioned that courts should look to the propriety of the emotional distress award.[209] The plaintiff testified that she was devastated and humiliated by her termination, and she had lost confidence in herself after losing her eleven-year career with United.[210] Although the plaintiff's testimony about her suffering was not "exceedingly graphic or detailed," the court held it formed a sufficient basis for the damages award.[211]

Using the Tenth Circuit's guidance in *McInerney*, the Court is not persuaded by Defendant's citations to awards in other cases. Rather, as the Tenth Circuit has cautioned, the focus should be on whether the compensatory damage was excessive in relation to Plaintiff's injury. As the Court has explained above multiple times in detail, there is more than sufficient evidence of severe emotional distress with physical manifestations. Thus, viewing the $230,000 award in relation to Plaintiff's injury, the award was not excessive.[212]

### 3. Improper or Prejudicial Evidence or Arguments

Defendant seeks a new trial on the basis of evidence and argument that it contends were improper and prejudicial. Specifically, Defendant alleges nine errors in the admission of

---

[207] 463 F. App'x 709 (10th Cir. 2011).

[208] *Id.* at 723.

[209] *Id.* (citing *Smith v. Nw. Fin. Acceptance, Inc.*, 129 F.3d 1408, 1416–17 (10th Cir. 1997) (considering the nature of the remarks made to the plaintiff, the nature of the harm suffered by the plaintiff, and the context of the discriminatory behavior); *Malloy v. Monahan*, 73 F.3d 1012, 1017 (10th Cir. 1996) (determining that "the award was adequately grounded in the evidence"); *Fitzgerald v. Mountain States Tel. & Tel. Co.*, 68 F.3d 1257, 1261, 1265–66 (10th Cir. 1995) (determining that damages awards were excessive based on a review of the record)).

[210] *Id.*

[211] *Id.* at 723–24.

[212] *See also Smith*, 129 F.3d at 1416–17 (upholding a $200,000 award in a sexual harassment case).

evidence or the allowance of certain statements by Plaintiff's counsel: (1) Plaintiff referring to

Defendant as "the State," (2) Plaintiff referring to the Constitution and the Bible, (3) Plaintiff

suggesting an amount to compensate, (4) the manner in which Plaintiff attacked the credibility of

certain witnesses, (5) Plaintiff advising the jury that Title VII and Title IX liability were the

same, (6) the Court's admission of evidence that related only to the previously dismissed

retaliation claim, (7) the Court not admitting evidence of Rick Fox's statement that the lawsuit

was his "pay day," (8) the Court's admission of testimony relating to Giles rubbing against

Plaintiff in a bathroom, and (9) the Court's admission of evidence relating to Plaintiff's

prescriptions. Some of these so-called errors were not properly preserved for review, as

Defendant failed to cite to the record supporting its statements and argument about them. But,

for those alleged errors that are properly preserved for review, neither individually nor

cumulatively did the alleged errors prejudice Defendant's rights.[213]

    First, Defendant alleges that Plaintiff improperly vilified Defendant by referring to it as

"the State" in Plaintiff's opening statement[214] and closing argument.[215] Defendant argues that

these references were meant to invoke prejudice of jurors who have a bias against the State.

Defendant merely speculates that any juror had a bias against the State, and the Court is

unwilling to engage in such speculation.[216] Defendant ignores the fact that the Court instructed

the jury to not be influenced by bias, sympathy or prejudice.[217] Defendant is undeniably an

entity of the State. Indeed, Defendant Pittsburgh *State* University stipulated in the Pretrial Order

---

[213] *See Henning v. Union Pac. R.R.*, 530 F.3d 1206, 1216–17 (10th Cir. 2008) (citing Fed. R. Civ. P. 61).

[214] Doc. 200 at 10:23–11:1, 12:2–9.

[215] Doc. 202 at 14:22–15:2; 17:23–18:1.

[216] Defendant also speculates that this jury was biased by news of a video that surfaced during this trial of then-presidential candidate Donald J. Trump making lewd sexual comments about women.

[217] Jury Instruction No. 13.

that it is "a state educational institution under Kansas law."[218]  Defendant was represented by the Attorney General's office for the State of Kansas.  The verdict will be paid from the State of Kansas's Kansas Tort Claims Fund.  Moreover, Defendant relied on its status as a state entity in asserting sovereign immunity in its motion for judgment, and in arguing that it should not have to post supersedeas bond.[219]

Second, Defendant alleges that Plaintiff improperly attempted to garner sympathy with references to the Constitution and the Bible as well as references to her being a custodian. Defendant fails to explain how any such references would garner sympathy, and the Court finds that such references were proper in the context of this case.  While the Court ruled in its *limine* order that Plaintiff's Exhibit 22,[220] a passage from the Bible, was inadmissible, it was proper for Plaintiff to explain a statement she made during her September 2013 meeting with Johnson.  In that meeting, Plaintiff told Johnson that Giles was lusting after her and that was wrong.  Johnson testified that she considered Plaintiff's statement homophobic; Plaintiff testified that it was a statement of her biblically-based belief that lusting after another person was wrong.  To the extent that was a reference to the Bible, it was proper, and was not offered to garner sympathy, but was offered to rebut Johnson's testimony about Plaintiff's state of mind.  Further, although Plaintiff referenced the Constitution in opening and closing, these were general references to the Fourteenth Amendment and to rights and protections granted by the Constitution, not appeals to award high damages, as Defendant claims.[221]  Nor was it improper for Plaintiff to be referred to as a custodian.  This is an employment case in which Plaintiff's job duties, and the terms and

---

[218] Doc. 81 at 2.

[219] *See* Doc. 249.

[220] Doc. 215 at 15.

[221] *See, e.g.*, Doc. 200 at 3:3:13–15 (quoting verbatim the Fourteenth Amendment).

conditions of her employment were germane.  In short,  none of these complained-of comments, singularly or cumulatively amounted to error affecting Defendant's rights.

Third, Defendant alleges that in her closing argument, Plaintiff improperly suggested to the jury that it should compensate her based on replacing wages, or based on other cases.  On the contrary,  Plaintiff argued that the jury should *not* base compensation on her wages.  In fact, Plaintiff argued that basing an award for sexual harassment on the plaintiff's wages "creates sort of a two-tiered system of justice, for people, high wage earners and low wage earners."[222] Plaintiff's counsel suggested that the emotional well-being of an executive who is harassed is no more valuable than the emotional well-being of a custodian. The Court does not find that Plaintiff's counsel suggested that she should be compensated based on lost compensation.[223] Plaintiff's counsel further suggested, "based it on cases we've had, similar ones,"[224] a range of damages, "from about 230,000 to $350,000,"[225] while acknowledging that the jury may think that range too high or too low.  This was not "extraneous matter" that warrants reversible error.[226]  The jury was instructed extensively to compensate based on the competent evidence of "the nature, extent, and duration of the harm."[227]

Further, as itemized above,  Defendant raised six other challenges to evidence or comments of Plaintiff's counsel pertaining to: impeachment of certain witnesses,[228] admission of

---

[222] Doc. 202 at 16: 3–14, 20–25; 17: 1–10.

[223] The Court finds Defendant's citation to *McInnis v. Town of Weston* 458 F. Supp. 2d 7, 19 (D. Conn. 2006) unpersuasive.  There the court held a jury award of $860,000 excessive given the plaintiff's counsel suggestion of a retirement income projection of $960,000 for only emotional distress evidence.  But here, Plaintiff's counsel suggested a range that was not based on salary, wage, or retirement losses.

[224] Doc. 202 at 16: 3–14, 20–25; 17: 1–10.

[225] *Id.*

[226] *Lambert v. Midwest City Memorial Hosp. Auth.*, 671 F.2d 372, 375–76 (10th Cir. 1982).

[227] *See* Jury Instruction No. 13.

[228] Defendant fails to cite to the record and fails to demonstrate how the complained-of impeachment was improper.  It was proper to question whether PSU attempted to influence Sherry Vineyard's testimony by granting

events that Defendant claims related only to the previously dismissed retaliation claim,[229] excluding admission of Rick Fox's statement that the lawsuit was his "pay day,"[230] admission of testimony about Giles rubbing against Plaintiff in a bathroom stall,[231] and admission of evidence relating to Plaintiff's prescription medication.   Defendant fails to cite to the transcript or record with respect to these six alleged errors.

When a party makes "mere conclusory allegations with no citations to the record or any legal authority for support' [this is] . . .  inadequate to preserve an issue for review."[232]  It is also inadequate to preserve an issue for purposes of a motion for judgment or new trial filed with a trial court.  This court's local rules require that *all* briefs and memoranda filed with the court contain "a concise statements of the facts, with each statement of fact supported by reference to the record;" and "the argument, which must refer to all statutes, rules, and authorities relied

---

her a shift change.  It was proper to examine Giles and McGowan about an allegation that they gave a "penis cup" to their own employee (of a cleaning business they owned), to impeach their testimony that they had no knowledge or awareness of sexual harassment.  It was proper to impeach Giles testimony that minimized her role in engaging in threatening or hostile behavior towards Plaintiff and Rick Fox, with an allegation that she angrily kicked a trashcan in a courtroom.

[229] As the Court explained at length in an earlier section of this order, *see* supra Part II.B.2.a, given the significant evidentiary overlap of the Title VII retaliation claim and the Title VII hostile work environment claim, the evidence Defendant complains about was relevant to both the dismissed Title VII retaliation claim and the surviving Title VII claim.

[230] In its *limine* order, the Court reserved ruling on this admission of this evidence, advising the parties to take up the issue with the Court during trial, when the Court would have context in which to weigh the probative value of the evidence with its prejudicial effect, as Rule 403(b) requires.  At trial, the Court conducted the Rule 403(b) balancing and found the evidence more prejudicial than probative.  Because Defendant failed to cite to the transcript on this point, it is unclear whether Defendant raised a contemporaneous objection to preserve this evidentiary ruling for appeal.

[231] Defendant complains that Plaintiff never mentioned this incident to Johnson, nor in her EEOC complaint, nor in her Complaint in this case, but raised it for the first time in her deposition.  Needless to say, it would have been proper for Defendant to impeach Plaintiff with the lateness of this revelation, so the jury could determine Plaintiff's credibility.  Because Defendant failed to cite to the record, the Court does not know whether Defendant impeached Plaintiff, but nothing precluded Defendant from impeaching Plaintiff with this.  In any event, this is not a ground for new trial.

[232] *Krumm v. Holder*, 594 F. App'x 497, 501 (10th Cir. 2014) (quoting *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 841 (10th Cir. 2005)).

upon."[233]  The trial court is no more equipped to comb through a voluminous trial record than the

appellate court is equipped to comb through that same voluminous trial record to find testimony

or evidentiary rulings the movant or appellant challenges.  As the Tenth Circuit put it,  "the

district courts [ ] have a limited and neutral role in the adversarial process, and are wary of

becoming advocates who comb the record of previously available evidence and make a party's

case for it." [234]  Thus, where a party does not cite to the record, the Court is under no obligation

to do so.[235]

This Court declines to comb through the record to find the testimony and/or evidentiary

rulings that Defendant challenges.  Nonetheless, the Court cannot ignore that some of

Defendant's challenges mischaracterize the Court's *limine* and/or evidentiary rulings, and

misstate what the Court ruled upon at trial.  For example, Defendant claims that while examining

Kristi McGowan about her yelling at Rick Fox,  "I'm going to fucking kill you," Plaintiff's

counsel himself yelled these words to McGowan.  Of course, had Defendant cited to the

transcript of that testimony, this challenge would be preserved for review.  But a transcript

cannot capture inflection, tone or volume.  And the Court clearly recalls that while Plaintiff's

counsel raised his voice with emphasis, he did *not yell* at McGowan.

Another example of Defendant misstating the record is in its argument that the Court

erred in excluding evidence relating to Plaintiff's prescription medication.  The Court did not

exclude all evidence concerning the prescription medication.  Both Plaintiff and Defendant were

allowed to inquire into Plaintiff's testimony that she had taken Xanax for anxiety before but

---

[233] D.Kan.Local Rule 7.6(a)(2).

[234] *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 672 (10th Cir. 1998).

[235] *See RMD, LLC v. Nitto Americas, Inc.*, No. 09-2056-JAR, 2012 WL 1033542, at *8 (D. Kan. Mar. 27, 2012) ("The court will not sift through the record in an attempt to locate or articulate arguments for [the party's] counsel.").

began taking a higher dosage for worsening anxiety after the harassment began. The only evidence the Court excluded was the prescription medication records and references to the prescription medication records. The Court excluded this evidence upon *Defendant's limine* motion to exclude the prescription records.[236] Despite obtaining this favorable ruling pre-trial, Defendant attempted to question Plaintiff about the very prescription records that the Court had excluded. This was in effect, Defendant's attempt to use a favorable *limine* ruling as a sword against Plaintiff. It was prejudicial to obtain a ruling that prevented Plaintiff from offering or testifying about her prescription records, and then cross examine Plaintiff about those records. This tactic suggested that Plaintiff was hiding her prescription records, when in fact it was Defendant that had gained their exclusion from the trial evidence. For that reason, the Court sustained Plaintiff's objection to Defendant's line of questioning about the prescription records.

And still another example of Defendant misstating the record is in its argument that Plaintiff misled the jury in closing arguments in stating "Title IX is a *little different* than Title VII."[237] But Defendant cites this statement out of context, for Plaintiff actually differentiated Title VII and Title IX claims, explaining at length the distinction between deliberate indifference and actual knowledge for purposes of Title IX.[238] Plaintiff also explained the different purposes underlying Title VII and Title IX. This was neither improper, nor prejudicial.

In short, to the extent Defendant cited to the record and preserved an objection, its points of error are without merit. And, with respect to those points that Defendant failed to preserve by citing to the record, to the extent the Court could reference the record without an arduous search, those alleged points of error are also without merit.

---

[236] Doc. 150.

[237] Doc. 202 at 5:7 (emphasis added).

[238] Doc. 202 at 5:18–21.

## 4. Admission of Audio Recording

Defendant argues that this Court improperly allowed Plaintiff, during the direct examination of Plaintiff, to play an audio recording of a meeting between Johnson and Plaintiff. This, Defendant argues was beyond the scope of the Court's *limine* ruling, which allowed the recording to be admitted only for impeachment purposes. Defendant further argues that the Court did not allow Defendant to play the recording during Defendant's cross-examination of Plaintiff. Like many of the alleged points of error addressed above, Defendant misstates the record.

During Plaintiff's case-in-chief, the Court admitted a *portion* of the audio recording of the March 7 meeting between Plaintiff and Johnson. This portion of the audio recording was played during the direct examination of Johnson, to impeach her testimony denying that she had admitted that Plaintiff had been subjected to sexual harassment.[239] This portion of the audio recording was also played during the direct examination of Plaintiff.[240] Defendant's argument that playing the recording during Plaintiff's testimony constituted improper bolstering is without merit. The tape recording was properly admitted as a party admission by Johnson, who during the meeting admitted that Plaintiff had been subjected to conduct so pervasive that it changed the nature of her work environment and made Plaintiff uncomfortable to come to work.[241] These were statements by Johnson, not by Plaintiff. A party admission is itself impeachment evidence,

---

[239] Doc. 201 at 47:14–19.

[240] Defendant did not attempt to cross-examine Plaintiff with such recording, and the Court did not forbid Defendant from doing so. Defendant's counsel did question Plaintiff about whether she told Johnson she was being recorded during the meeting, and Plaintiff alleged she had an "under surveillance" sticker on her shirt. However, Defendant's counsel did not seek to admit other parts of the audio recording nor place in context, any statements recorded in the audio clip played by Plaintiff.

[241] Doc. 200 at 90:1–21 (referring to Pl's Ex. 57bb).

and thus was properly admitted, and was properly published to the jury during the testimony of Johnson and during the testimony of Plaintiff.

Moreover, Defendant misstates the record when it argues that the Court precluded it from playing the audio recording during cross examination. Defendant cagily fails to explain that during Johnson's testimony in Plaintiff's case-in-chief, Defendant sought to play the *entire* recording, not the *portion* that Plaintiff had already played. And Defendant fails to explain that while Plaintiff had designated that *portion* of the recording as evidence, Defendant had failed to counter-designate the entire recording as evidence. Because Defendant had failed to follow the Court's order to designate what portion(s) it would seek to admit at trial,[242] the Court fashioned a remedy, in the midst of trial, to address Defendant's failure. Because Defendant intended to call Johnson in its own case-in-chief, the Court directed Defendant to wait and play the entire recording during Johnson's testimony in its case. This would allow Plaintiff time to review the entire recording, something that would have been accomplished pretrial, had Defendant followed the rules on designating exhibits.[243] The Court combed through a rough transcript of Johnson's testimony in Defendant's case in chief,[244] and the Court could not find where Defendant sought to admit the audio clip and was not allowed to do so. There was no error and Defendant suffered no prejudice.

---

[242] Doc. 201 at 65–70.

[243] There is a dispute whether Plaintiff's counsel received the designations the night before Johnson's testimony or during Johnson's testimony. Regardless, this was inadequate time to review the designation, so it was proper for the Court to give Plaintiff additional time for review. This is especially so in light of Johnson testifying in Defendant's case-in-chief, so it was not prejudicial.

[244] Defendant did not order trial transcript for its own witnesses. The Court was forced to rely on a rough transcript of Johnson's direct examination in Defendant's case in chief.

### 5.     Jury Instructions

Defendant's final argument relates to Jury Instruction No. 14, Jury Instruction No. 9, and the Title IX Jury Instructions.  This Court has already ruled above that Title IX was properly applied in this case, so it overrules Defendant's objections to the Title IX instructions.  However, the Court will address Jury Instruction No. 14 and Jury Instruction No. 9 in turn.

Jury instruction No. 14 (the "Eggshell Skull Instruction") read:

> If you find in favor of Plaintiff on either one of her claims of sexual harassment,
> Defendant is responsible for any and all damages resulting from that sexual harassment.
> This is regardless of whether Plaintiff suffered from a preexisting psychological
> condition that made the consequences of the sexual harassment more severe for Plaintiff
> than they would have been for a person without the same condition.
>
> In determining whether Defendant caused Plaintiff's claimed distress, you are allowed to
> consider evidence of other probable causes of such distress.

Defendant argues that the Eggshell Skull Instruction is only properly applied to tort cases alleging physical injury, not mental distress.  Defendant further argues that this instruction is properly given only in tort cases and by giving it in this case, the Court created an "implied" tort remedy outside of any waiver of sovereign immunity.

The parties do not cite, nor has the Court found, Tenth Circuit case law considering an "eggshell skull" jury instruction in a Title VII or Title IX case.   In *Wren v. Spurlock*, the Tenth Circuit considered a similar jury instruction on the effect of pre-existing conditions in a § 1983 case claiming plaintiff's employer retaliated against her for the exercise of her First Amendment rights.[245]  That instruction read:

> A person who has a condition or disability at the time of an injury is not entitled to
> recover damages therefor. However, she is entitled to recover damages for any
> aggravation of such preexisting condition or disability proximately resulting from the
> injury.

---

[245] 798 F.2d 1313, 1321 (10th Cir. 1986).

> This is true even if the person's condition or disability made her more susceptible to the possibility of ill effects than a normally healthy person would have been, and even if a normally healthy person probably would not have suffered any substantial injury.
>
> When preexisting condition or disability is so aggravated, the damages as to such condition or disability are limited to the additional injury caused by the aggravation.[246]

The Tenth Circuit found the district court did not err in giving such an instruction because "[i]t ensured that the jury would award only that sum arising from [the defendant's] aggravation of whatever preexisting condition or disability may have plagued [the plaintiff], not the sum that would compensate her for her total disability."[247]

The Court finds *Wren* instructive. *Wren* instructs that the consideration of pre-existing conditions in awarding damages is applicable beyond tort and personal injury; and pre-existing conditions may also be mental, not just physical. Moreover, consideration of pre-existing conditions does not create an "implied" tort remedy or cause of action. Rather, it is a limitation on damages.[248] For that reason, sovereign immunity is not implicated. The Court concludes, based on *Wren*, that the Eggshell Skull Instruction was properly given in this case.

Further, at least one circuit has considered the propriety of an "eggshell skull" instruction in a Title VII employment case. In *Jenson v. Eveleth Taconite Co.*, a Title VII sexual harassment and a Minnesota Human Rights Act case,[249] the Eighth Circuit explained that the "eggshell skull" principle was properly applied because "foreseeability does not limit an award of money damages," including "damages assessed against a tortfeasor for harm caused to a plaintiff who happens to have a fragile psyche."[250]

---

[246] *Id.*

[247] *Id.* at 1322

[248] *Id.* (considering the pre-existing conditions instruction as "tend[ing] to limit the amount of recoverable damages.").

[249] 130 F.3d 1287, 1295 (8th Cir. 1997).

[250] *Id.*

Defendant cites a number of cases for the proposition that a reasonable person standard is applied to ensure that employers are not liable for overly sensitive employees. But, Defendant conflates the substantive elements of a sexual harassment claim arising under Title IX and Title VII with the "eggshell skull" concept for determining compensatory damages. While there is both an objective and subjective element for considering whether a work environment was hostile under Title VII,[251] that concerns the determination of liability, not the determination of whether compensatory damages that should be awarded.

Defendant also argues that the Eggshell Skull Instruction is confusing and misleading in that it contradicts Jury Instruction No. 13 and No. 11. Defendant argues that the Eggshell Skull Instruction conflicts with the language in Jury Instruction No. 13, that "[y]ou may award compensatory damages only for injuries that Fox proves were caused by Defendant's allegedly wrongful conduct." Defendant also argues that the Eggshell Skull Instruction conflicts with the language in Jury Instruction No. 11, that "[y]ou must look at the evidence from the perspective of a reasonable person's reaction to a similar environment under similar circumstances. You cannot view the evidence from the perspective of an overly sensitive person . . . the alleged harassing behavior must be such that a reasonable person in the same or similar circumstances as Fox would find the conduct offensive."

But Defendant's arguments are without merit. As to Jury Instruction No. 11, Defendant conflates the substantive elements of Title VII and Title IX liability and the assessment of the proper amount of damages as explained above. And, as to Jury Instruction No. 13, the statement that compensatory damages may only be awarded for damages Defendant caused is not in conflict with the "eggshell skull" concept. In fact, the Eggshell Skull Instruction requires that

---

[251] *See, e.g.*, *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir. 2012) ("A dual standard asks both whether the plaintiff was offended by the work environment and whether a reasonable person would likewise be offended.").

the jury account for Plaintiff's pre-existing condition, which may have made her more susceptible to damages, when determining the proper amount of compensatory damages. Further, as Jury Instruction No. 13 properly explains, the proper amount is not the total disability suffered, but only those Defendant caused.

Defendant next argues that even if the Eggshell Skull Instruction is properly given for these types of claims, the evidence in this trial did not support the giving of this instruction. The Court disagrees. Plaintiff testified that she had pre-existing anxiety following the death of her mother. She testified at length about her anxiety prior to the harassment. She also testified that she was taking Xanax for anxiety and that she increased her dosage when her anxiety worsened during the period of harassment. There was no medical testimony to confirm her diagnosis, nor prescription records, which were excluded on Defendant's *limine* motion. But, Plaintiff provided competent and credible evidence of her condition. The evidence at trial warranted an instruction on her pre-existing condition.

Defendant also claims error in Jury Instruction No. 9, which defined "harassment." Defendant argues it improperly instructed on overtly gender related conduct.[252] The instruction states in relevant part: "But discriminatory intimidation, ridicule, unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct that is *overtly or not overtly based on Plaintiff's sex*, may be sufficiently extreme to alter the terms and conditions of employment."[253] As the Court explained at length above, [254] facially gender-neutral abusive conduct can support a gender-based hostile work environment claim when "viewed in the

---

[252] The Court rejects Defendant's argument that this additional language was added after the deadline for submission of jury instructions. The Court in the Pretrial Order merely requested "proposed" instructions, and these were subject to change during both the informal and formal jury instruction conferences. Doc. 132 at 5.

[253] Jury Instruction No. 9 (emphasis added).

[254] *See supra* Part II.B.2.b. (explaining that the jury may properly consider both overtly and not overtly gender related conduct).

context of other, overtly gender-discriminatory conduct." [255]  There was evidence presented of both overtly and not overtly gender-related conduct.  Thus, the jury was properly instructed it could consider both.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for Renewed Judgment as a Matter of Law as to the Title IX Claim (Doc. 207) is **denied**.

**IT IS THEREFORE FURTHER ORDERED BY THE COURT** that Defendant's Motion for Renewed Judgment as a Matter of Law as to the Title VII Claim (Doc. 209) is **denied**.

**IT IS THEREFORE FURTHER ORDERED BY THE COURT** that Defendant's Motion for New Trial or in the Alternative For Remittitur (Doc. 214) is **denied**.

**IT IS SO ORDERED.**

Dated: June 26, 2017

                                        S/ Julie A. Robinson
                                        JULIE A. ROBINSON
                                        UNITED STATES DISTRICT JUDGE

---

[255] *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1097 (10th Cir.1999); *see also Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005) ("The question then becomes whether Plaintiffs can use a substantial amount of arguably gender-neutral harassment to bolster a smaller amount of gender-based conduct on summary judgment.  Our precedents say that they can.").